## *In re* Extradition of TULLY.

*(Circuit Court, S. D. New York.   June 18, 1884.)*

1. EXTRADITION—FORGERY
    Checks or drafts drawn by an agent, and signed with the name of the principal, and by the agent, "per procuration," are not forgeries, whether the agent has or has not authority to draw them, since in either case they are nothing different from what they purport to be.

2. SAME—EMBEZZLEMENT—FALSE ACCOUNTS.
    False entries made in the usual books of account, or *memoranda* on slips directing such entries by others, made by an officer or employee of a bank for the purpose of concealing his embezzlements, do not constitute forgery, as defined and recognized by the courts of England; and where a person is held for extradition to England for forgery on such proofs only of acts committed in England, he should be discharged on *habeas corpus.*

3. SAME—LEX LOCI CONTRACTUS.
    Falsification of written evidence against another is forgery at common law; and where, by the law of the place, a clerk's or paying teller's daily entries in the course of his duty, supplemented by his own oath, in the absence of his recollection on the subject, are admissible in evidence in his own discharge, in respect to moneys received by him, *semble,* that the falsification of such entries for the fraudulent purpose of concealing embezzlements should be deemed forgery.

Extradition.   *Habeas corpus* and *certiorari.*

*F. F. Marbury,* for the British government.

*A. P. Whitehead,* for the Preston bank.

*C. S. Luscomb,* for the accused.

BROWN, J. Gerald Thomas Tully having been held by a United States commissioner for extradition to England on a charge of forgery, the accused has been brought before this court, together with the proceedings upon which he was held, upon writs of *habeas corpus* and *certiorari.* There is no dispute about the facts. The only question presented is whether the offense constitutes the crime of forgery under the treaty with Great Britain. The record shows that Tully was the submanager of the Preston Banking Company, (Limited,) a banking company in Preston, England; that the bank had various banking agencies in the vicinity accustomed to have funds on its account; that it was the duty of Tully, as submanager, to regulate the balances standing to the bank's credit with its various agents, and when the amount of any particular agent was considered too high it was his duty to make some withdrawal of funds and apply them for other bank purposes; that the bank had been accustomed to make advances of money on security to Messrs. Railton, Sons & Leedham, of Manchester; that Tully "had a general authority from the Preston Bank to draw checks upon its agents in reducing their balances;" the practice on doing so was for Tully to fill out a printed memorandum, termed a "blue-slip," showing the amount drawn, and from whom, and how the proceeds were disposed of. These printed blanks were in the following form:

"PRESTON, ———.

*"Preston Banking Co.*

"Debit, ———.
"Credit, ———."

When such slips were filled out Tully signed them with the letter P. simply, which stood as his signature and authentication of the transaction stated in the memorandum. The blue-slips were then handed to the accountant's department, from which the proper entries were made in the books of the bank, and the slips were preserved as vouchers.

The complaint charges, and the proof shows, that Tully, upon three occasions, drew checks upon the bank's agents, received the money from them, and rendered to the bank blue-slips crediting the drafts to the agents, and directing the debit of the amounts to certain customers of the bank. The proof warrants the inference, however, that the money was appropriated by Tully to his own use, and not invested with the persons against whom it was charged. Three transactions of this kind are mentioned in the complaint, all similar, one of which is as follows: On the twenty-third of October, 1882, Tully drew a check upon the Manchester & Salford Bank, (Limited,) for £1,000, payable to selves or bearer signed per pro. the Preston Bank Company; G. T. Tully, submanager." The drawee was one of the agents of

the Preston Bank. Tully received the money in person, and on the fourth of November following rendered to the accountant's bureau of the Preston Bank the following blue-slip:

"PRESTON, 4–11–1882.

"*The Preston Banking Company.*

"Debit, investment ac. to Railtons.
"Credit, M. & S. Bk. Man.    do.
"£1,000.00.

In October, 1883, Tully absconded. On examination of the books and accounts several leaves of the investment ledger were found missing, and Railtons' account was missing. Evidence from the Railtons shows that no such moneys were received by them.

The complaint charges forgery in respect to the drafts, and also forgery in respect to the blue-slips, in uttering a "certain written instrument purporting to be an accountable receipt, acquittance, and receipt for money, dated on the fourth day of November, 1882, for the sum of £1,000, purporting to be invested with Railton, Sons & Leedham."

The commissioner held that the crime of forgery was not made out in repesct to the checks or drafts upon which the money was procured by Tully; but he has held the prisoner for forgery on the ground that the blue-slips were accountable receipts.

Forgery is defined by Blackstone as "the fraudulent making or alteration of a writing to the prejudice of another man's right." 4 Bl. Comm. 247. I have not found any more succinct or accurate definition than this. Greenleaf adds: "It may be committed of any writing which, if genuine, would operate as the foundation of another man's liability, or the evidence of his right." 3 Greenl. Ev. § 103. In one of the latest English cases (*The Queen* v. *Ritson,* L. R. 1 Cr. Cas. 200) it is defined as including "every instrument which fraudulently purports to be that which it is not;" and in that case it was held that a false date inserted in a deed by the grantor, prior to the time of its execution, for the fraudulent purpose of overreaching an intervening incumbrance, was forgery on the part of the grantor, because it was a false deed purporting to be what it was not; namely, a deed of the date stated, designed to cut off, by means of a false date, an existing right.

As respects the checks, the evidence shows that Tully had authority to draw them upon the bank's agents in the precise form in which these were drawn; and there is no proof that the circumstances of the agent's accounts were not such as warranted the drafts. The act was done in his ordinary course of business; it was an act which he was authorized to do; and there was nothing false or irregular about the checks themselves; his acts in drawing these checks were therefore rightly held not to constitute forgery. Even if Tully had had no authority to draw these checks, they would not, according to the

English law, have constituted forgery, as was held by the 15 judges in *Regina* v. *White*, 2 Car. & K. 404, because the signature by him in his own name "per procuration," etc., showed on its face all that it purported to be, and was not a false making.

As respects the blue-slips, if I were at liberty to consider the question presented as an original one, in connection with the law of evidence prevailing in this state, I should be inclined to hold that they might possibly constitute forgery at common law; on the ground that, under the usage of the bank and the course of dealing, these blue-slips, as between Tully and the bank, when supplemented by his own oath, as correct entries made at the time of the transaction and in the course of his official duty, might, in the absence of his own recollection, become evidence in his favor, admissible under our rules of evidence, to show an investment by him of the moneys he had received as stated in the slips, and hence tending to show an acquittance to him therefor as against the bank; that these slips were precisely equivalent to entries in the books of the bank by Tully, and of the same effect as if it had been the practice for Tully to make entries in the books of the bank instead of rendering the blue-slips for the purpose of such entries by others. Such entries in the books of the bank, in the course of his daily duties, would, in connection with his own oath, I think, afford some corroborative evidence in themselves, as against the bank, in favor of the person making them as parts of the *res gestæ*. Whart. Crim. Law, §§ 663–668; 1 Greenl. Ev. § 118*m; McGoldrick* v. *Traphagen*, 88 N. Y. 334; *Chaffee* v. *U. S.* 18 Wall. 516, 541; *Bank of Monroe* v. *Culver*, 2 Hill, 531; *Conklin* v. *Stamler*, 2 Hilt. 423, 428; *Burke* v. *Wolfe*, 38 N. Y. Super. 263; *Biles* v. *Com.* 32 Pa. St. 529; 1 Tay. Ev. §§ 697–712. When such entries are made falsely and fraudulently in order to conceal embezzlements, they might well, I think, under our law, be held to be forgeries at common law, as papers falsely made to the prejudice of the bank; because capable of being made use of, in connection with his own oath, as evidence against it: and the false manufacture of written evidence against another is clearly forgery. Herein, as it seems to me, lies the distinction between papers or documents capable of such a use, and others which are merely false statements and can have no such legal effect to another's prejudice. A letter written by an agent to his principal containing a false and fraudulent account of a business transaction is not forgery, because it has not, and cannot be made to have, any legal force or validity in itself against any other person than the writer. However false its statements, it is precisely what it purports to be, and nothing else, and not capable of any other use. *State* v. *Young*, 46 N. H. 266. But if the principal should insert in the letter an alteration injurious to the agent, the alteration would be forgery on his part, because false, and because the letter would be *prima facie* evidence against the agent. So if a check delivered in payment of goods purchased be drawn fraudulently against a bank where the drawer has no funds, and has

no reason to expect payment, such a check is not forgery, since it binds nobody but the drawer, and is precisely such as he made it and intended it to be; but if the holder fraudulently increase the amount payable after the check has been signed, that is forgery on his part, because the check is evidence and apparent authority for drawing an amount of money which the maker never authorized. In all these cases the distinction seems to me to turn upon the question whether the instrument has, or can be made to have, any legal force or effect, in itself considered, against any other person than him who makes the false statement or alteration. If it has, and is designed and calculated to deceive, it is forgery; otherwise not. This distinction, I think, is well shown in the case of *Regina* v. *White,* above referred to. 2 Car. & K. 404. There the accused was held, at *nisi prius,* guilty of forgery for indorsing a check "per procuration Thomas Tomlinson," adding his own name; upon which he drew the amount of the check, stating at the time that he was authorized to sign in that manner. He had in fact no authority to sign in that manner. On appeal before the 15 judges, the verdict was set aside as erroneous, on the ground, as I understand, that there was nothing in the signature that purported to be anything different than what it was; and though the indorsement "per pro.," etc., was false, that signature was no evidence whatever against Tomlinson of any authority from him, and could not be made such; but was merely a naked false statement in writing. Entries in pass-books, on the other hand, purport to bind the parties, and are evidence of accountability for the amounts entered, and hence a subject of forgery. *Regina* v. *Moody,* 9 Cox, Cr. Cas. 166, 168.

In this case, if the blue-slip were nothing more than a mere direction to the accountants to credit the agent and charge Railton, although it contained by implication a representation of the investment of the amount named with the Railtons, that would not have constituted forgery, but merely a false representation in writing. It could only become forgery by virtue of some quality as evidence which it might possibly acquire in Tully's favor, under the usage and practice of the bank and the law of the place, tending to acquit him for the money which he had drawn from the agent.

For the purposes of this hearing, however, on a claim of extradition by the British government, I am precluded from passing upon this as an original question, in connection with the rules of evidence prevailing here, because this transaction was in England, where a different rule of evidence seems to prevail, (3 Bl. Comm. 368; 3 Barn. & Ald. 142;) and also because, in a case identical with the present, as it seems to me, in all essential particulars, the court of appeal in England has held this offense not to be forgery. I refer to the case of *Charles Windsor,* 6 Best & S. 522, who, in 1865, was arrested in London on the charge of forgery upon the Mercantile Bank of this city, in making false and fraudulent entries in the books of the bank.

Windsor, the paying teller of the bank, had embezzled upwards of $200,000, and concealed his crimes by entering upon the bank's books some $200,000 as coin and cash in vault, which was not there. By these fictitious entries, carried along for a period of two years, he concealed his embezzlements. In the argument before the court of appeal, on *habeas corpus*, counsel called the attention of the court to the claim that such an entry "is virtually a statement by the bank, and would be evidence against them." The point was overruled, although the rules of evidence prevailing here were not considered. Opinions were delivered by COCKBURN, C. J., and BLACKBURN, J., with SHEE, J., concurring. COCKBURN, C. J., says:

"No doubt this was a false entry, and made for fraudulent purposes; but it is clear that the offense did not amount to forgery. We must take the term 'forgery' in the extradition act to mean that which by universal acceptation it is understood to mean, namely, the making or altering a writing so as to make the writing or alteration purport to be the act of some other person, which it is not."

BLACKBURN, J., says:

"Forgery is the falsely making or altering a document to the prejudice of another, by making it appear as the document of that person; telling a lie does not become forgery because it is reduced to writing."

The statute of the state of New York, making the offense forgery in the third degree, was held, and no doubt rightly, not to extend the force of the treaty to offenses not embraced within the definition of forgery at the time when the treaty was executed. The prisoner was accordingly discharged. There has been no change in the laws or statutes of either country, in this respect, so far as I know, since this decision.

It is immaterial what my own judgment might be, whether as an original question the *Case of Windsor* or that of Tully constitutes forgery at common law, so long as the point has been adjudicated to the contrary in England, in whose behalf the extradition is here sought. The blue-slips in this case cannot by possibility have any greater effect than Tully's own entries in the books of the bank, according to the usages of the bank, would have had. It is only as some possible evidence in Tully's favor that such entries, or these blue-slips as the equivalent of such entries, could be anything more or different than they purport to be. The attention of the English court of appeal being called to this point, they overruled it as insufficient. This adjudication must be deemed to be the settled law of England until in some way modified or reversed, and I have not found any contrary or inconsistent adjudication. While the definitions of forgery there given are in some respects, I think, too limited, the *Case of Windsor*, as an authority, determines the English law as regards forgery in this particular. By that adjudication Tully could not be convicted or lawfully charged with the offense of forgery in respect to the transactions here complained of; and it would evidently

be improper to order his extradition upon a charge which the law of that country declares cannot be maintained as constituting forgery under the treaty.

The prisoner should therefore be discharged.