**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 9, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

GREGORY VINCENT HUNT,

        Defendant-Appellant.

No. 05-6023

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. CR-01-61-C)**

Susan Dickerson Cox, Assistant United States Attorney (Robert G. McCampbell, United States Attorney, with her on the briefs), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

Robert L. Wyatt IV of Wyatt Law Office, Oklahoma City, Oklahoma (Gloyd L. McCoy of McCoy Law Firm, Oklahoma City, Oklahoma, with him on the briefs), for Defendant-Appellant.

Before **BRISCOE**, **McKAY**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

Gregory Hunt was indicted on 65 counts of securities forgery and 41 counts of money laundering, based on a series of checks he wrote transferring more than $2 million from his employer's bank accounts to private accounts under his control. He used the funds to engage in commodities speculation and to buy himself a boat. Later, he altered carbon duplicates of the checks to make it appear they had been written to a different payee. Over the course of two trials before the district court, he fabricated a document purporting to authorize the payments, then attempted to bribe a witness to give "beneficial" testimony at trial. The jury convicted him on all 106 counts, and he was sentenced to serve 63 months in prison and to pay millions of dollars in restitution and forfeiture.

Despite this series of flagrant deceptions, however, Mr. Hunt did not utter "forged" securities within the meaning of 18 U.S.C. § 513(a), the statute under which he was charged. Mr. Hunt signed the checks using his own true name, and the instruments explicitly and accurately identified him as an "authorized agent" of his employer. Whatever else he has done, Mr. Hunt did not commit forgery. With great reluctance, we must therefore reverse his conviction and remand the case with instructions to enter a judgment of acquittal.

## I. Factual and Procedural Background

Mr. Hunt worked as the manager of the Orienta Cooperative Association ("Orienta") from April 1990 to February 2000. In that capacity, he had check-writing authority for two of Orienta's checking accounts at Cleo State Bank in

Cleo Springs, Oklahoma. His name appeared on the signature cards, on file with the bank, for Orienta's general operating account and grain purchase account. So far as the bank was concerned, Mr. Hunt enjoyed unlimited check-writing privileges.

Privately, however, Orienta placed a number of limits on Mr. Hunt's authority to write checks as its agent. Mr. Hunt was authorized, for example, "to buy and sell grain," App. 465, to "buy and sell merchandise for the organization," *id.*, and "to pay the legitimate bills" of the cooperative, *id.* at 468. Yet according to all seven individuals who served as members of Orienta's board during the relevant period, Mr. Hunt was not authorized to withdraw funds for purposes of hedging or speculating in agricultural commodities on behalf of Orienta.

Between March 1997 and December 1999, Mr. Hunt wrote a series of 65 checks totaling $2,014,482.55 drawn on Orienta's bank accounts. All 65 checks listed Orienta's name and address and were signed in ink by Mr. Hunt, using his own signature on a line labeled "AUTHORIZED SIGNATURE." App. 1246–1373. The first 5 were payable to "B&H Special" and the remaining 60 were payable to "B-H Inc." Neither payee was a legitimate creditor of Orienta.

All but two of the checks were deposited in a "B&H Special" account at the First National Bank of Thomas in Thomas, Oklahoma, controlled by Mr. Hunt and his nephew, Bruce Brinson. (The "B" and "H" stood for Brinson and Hunt.) Whenever the First National Bank of Thomas contacted the Cleo State Bank to

verify the sufficiency of funds in Orienta's accounts, providing the account number, check number, date, and Mr. Hunt's name as the person who signed the check, the Cleo State Bank responded that "it was okay" and "that it was a true check." *Id.* at 917. Mr. Hunt used the other two checks, which totaled $71,500, to purchase a $60,000 cashier's check for deposit in a commodities investment account at R.J. O'Brien, and deposited the $11,500 balance in the B&H Special account. Although the checks themselves were never altered, at some point pink carbon copies of some checks written to "B-H Inc." were altered to list the payee as "B-K Inc."—the name of a former customer of Orienta.

For trial, the government produced a summary of all activity in the B&H Special account between March 1997 and February 2000. Almost all of the more than $2.09 million deposited in the account came from Orienta; the only other sources of funds were approximately $112,000 in deposits from an account at Archer Daniels Midland Investor Services ("ADMIS") and $26,000 in transfers from Mr. Hunt's personal account at the First National Bank of Thomas. Meanwhile, Mr. Hunt used the account to transfer more than $1.58 million to the ADMIS account and more than $142,000 to the R.J. O'Brien account for purposes of commodities hedging and speculation. Those transactions served as the basis for the 41 counts of money laundering in the indictment. He also transferred nearly $340,000 to his personal account, and wrote smaller checks worth thousands of dollars to his nephew and other family members. In April 1997, he

used the account to buy himself a Glastron boat, 115 horsepower engine, and trailer, at a cost of more than $15,000. A year later he used the account to make a $1,500 donation to the Kappa Alpha Order, and in October 1998 he used it to make a $4,500 purchase at Sander Sporting Goods & ATVs.

Mr. Hunt's first trial took place in June 2001. He admitted using Orienta funds to hedge and speculate in commodities, but defended on the ground that the Orienta board of directors had authorized him to do so. *United States v. Hunt*, 62 Fed. App'x 272, 274 (10th Cir. Apr. 3, 2003) (unpublished). Indeed, he claimed that the board had entered a written trading agreement authorizing him to invest on Orienta's behalf and to collect a 10% commission for himself, but that the document must have been stolen during a burglary of his home. The jury convicted him on all 106 counts. He was sentenced in November 2001 to 70 months in prison, more than $2.1 million in restitution, and more than $1.6 million in forfeiture. Mr. Hunt did not serve any time, however, because the district court granted his motion for release pending appeal.

In September 2003, Mr. Hunt moved for a new trial based on newly discovered evidence. Attached to the motion was a document entitled "TRADING CONTRACT," dated March 15, 1994 and signed by the President and Secretary of the Orienta board of directors, purporting to "grant permission and authorize Manager Greg Hunt to trade futures commodities on behalf of the Orienta Cooperative Assn." App. 2322. Mr. Hunt claimed to have found the lost

document in a dusty vinyl portfolio wedged in the back of a filing cabinet in his home. Within three days, a forensics expert determined that neither official had in fact signed the "trading contract," and that the signatures had been photocopied from other documents. With the deception exposed, the district court granted a motion by Mr. Hunt to withdraw the request for a new trial.[1]

In March 2004, the district court granted a motion by Mr. Hunt to vacate his sentence pursuant to 28 U.S.C. § 2255. Mr. Hunt argued that he received ineffective assistance of counsel at trial because his attorney, Wayne Fournerat, had solicited Orienta stockholders to join a class-action shareholder suit against Mr. Hunt and members of the Orienta board. Some time before trial, Mr. Fournerat had discovered the existence of annual errors and omissions insurance policies, each with a limit of $5 million, that appeared to cover Mr. Hunt's wrongdoing. By collecting on policies from several consecutive years, Mr. Fournerat believed he could win the class an award "into the tens of millions," and he undoubtedly realized that a guilty verdict for Mr. Hunt would greatly

---

[1]Mr. Hunt points out that "[t]here was no evidence that Mr. Hunt created the [falsified] document." Appellant Hunt's Opening Br. 53–54 & n.2. Yet the original motion, submitted by Mr. Hunt through counsel, described at length the manner in which Mr. Hunt supposedly made the serendipitous discovery of the document. The document also corroborated Mr. Hunt's own testimony at the first trial concerning the existence of such a document. The district court ultimately found enough evidence of Mr. Hunt's involvement to admit the phony document as probative of consciousness of guilt. Reciting the facts in the light most favorable to the government, as we must following a guilty verdict, we assume that Mr. Hunt played a role in the fabrication.

assist the shareholder suit. Order of Mar. 5, 2004, at 7. The district court found

that Mr. Fournerat "operated under an actual conflict during the trial and that

conflict actually affected the adequacy of his representation." *Id.* at 11. It

therefore granted Mr. Hunt a new trial.

Mr. Hunt's second trial took place in September 2004. This time Mr. Hunt

elected not to testify. As part of its case-in-chief, the government introduced

evidence of the altered pink carbon copies of the checks and the fabricated trading

contract with photocopied signatures. In addition, a member of the Orienta board

named John Warfield testified that Mr. Hunt approached him before the second

trial and offered him a bribe, assuring him that he would be "well compensated or

well paid" if he could "give any testimony that would be beneficial." App. 670.

The district court immediately sustained an objection under Rule 404(b) of the

Federal Rules of Evidence on the ground that the prosecution had failed to

properly notify the defense of that line of questioning, and instructed the jury to

disregard the statement.

Once again, Mr. Hunt was convicted on all 106 counts. His second

sentence called for a slightly shorter prison term of 63 months, but included the

same multimillion dollar restitution and forfeiture penalties as the first sentence.

Also, once again, the district court granted Mr. Hunt's motion for release pending

appeal. Mr. Hunt indicated that he planned to appeal, in part, on the ground that

he had not committed forgery within the meaning of 18 U.S.C. § 513(a). In its ruling, the district court explained:

> I think there is a plausible argument, at the least, that the defendant was charged under the wrong statute, and it certainly caused a lot of work in my chambers. . . . I think [my decision is] supported by the case law but I think there is, at the least, a very plausible argument to the contrary. . . . Because of the impact of the ruling on the appropriate statute, which, of course, would vitiate the entire conviction in this case if [Mr. Hunt] is right, and because of the plausibility of that argument, and I don't want to say probability, but it is not a specious argument; it is one [as to which] I think legal minds could differ, and I am going to permit Mr. Hunt to be released on bail pending appeal.

*Id*. at 1243.

Mr. Hunt now appeals, bringing seven challenges to his conviction: (1) that the checks did not qualify as "forged" securities under § 513(a); (2) that the evidence was not sufficient to prove that Mr. Hunt harbored "intent to deceive another person"; (3) that the conviction depended on an impermissible constructive amendment to the indictment; (4) that the evidence was not sufficient to convict Mr. Hunt of money laundering because he did not engage in the underlying forgery; (5) that evidence of Mr. Hunt's attempt to bribe a witness deprived him of a fair trial, even though it was excluded; (6) that evidence of the fabricated "trading contract" deprived Mr. Hunt of a fair trial; and (7) cumulative error. He also raises a Sixth Amendment challenge to his sentence.

## II. Discussion

A short list of Mr. Hunt's apparent crimes would appear to include embezzlement, various species of fraud, and repeated and brazen obstruction of justice. Yet federal prosecutors elected to charge Mr. Hunt with uttering "forged securities" in violation of 18 U.S.C. § 513(a). App. 28. This case therefore turns on whether a check written by an agent with check-writing authority, and signed by the agent using his own name, qualifies as "forged" under § 513 because the agent exceeded the bounds of his contractual authority with the principal. The government concedes that if Mr. Hunt did not violate the forgery statute, his conviction must be reversed in its entirety. The 41 counts of money laundering depend on some underlying unlawful activity, *see United States v. Rahseparian*, 231 F.3d 1257, 1264 (10th Cir. 2000), and forgery is the only other crime with which Mr. Hunt was charged.

The statute provides:

[W]hoever makes, utters or possesses a forged security of a State or political subdivision thereof or of an organization, with intent to deceive another person, organization, or government shall be fined under this title or imprisoned for not more than ten years, or both.

18 U.S.C. § 513(a). For purposes of the section, the term "security" includes checks. *Id.* § 513(c)(3)(A). The statute also defines "forged":

[T]he term "forged" means a document that purports to be genuine but is not because it has been falsely altered, completed, signed, or endorsed, or contains a false addition thereto or insertion therein, or is a combination of parts of two or more genuine documents.

- 9 -

*Id.* § 513(c)(2).

According to the government, Mr. Hunt committed forgery because the checks were "falsely . . . completed" within the meaning of § 513(c)(2): "B & H was not a legitimate creditor of Orienta, and defendant exceeded his authority in completing the checks because he was not authorized by the Orienta Board of Directors to write the checks to B & H Special and use the proceeds to his own benefit." Gov't Br. 8. The government concedes that "[t]here is nothing false about the 'content' of any of the 65 checks," but maintains that "[t]he checks could not have been genuinely executed because they reflected no legitimate payment from the coop that defendant was authorized to make." *Id.* at 17–18.

The term "forged" has a long history and specialized meaning at common law, and we begin our analysis of the statute with reference to that history. We then turn to the statutory definition of the term "forged," which we must construe in light of the two leading Supreme Court cases on federal forgery statutes, *Gilbert v. United States*, 370 U.S. 650 (1962), and *Moskal v. United States*, 498 U.S. 103 (1990). Finally, we look to the legislative history of § 513, in the form of a detailed committee report, to clarify the meaning intended by Congress. All three sources compel the same conclusion: that Mr. Hunt did not utter "forged" securities under § 513(a).

### A. *Forgery at Common Law*

When Congress enacted § 513(a) in 1984, it used the word "forged"—a term with a rich history at common law. *See* Comprehensive Crime Control Act of 1984, Title II, § 1105(a), Pub. L. No. 98-473, 98 Stat. 1837, 2144 (originally codified at 18 U.S.C. § 511). Under such circumstances, "we begin our interpretation of statutory language with the general presumption that a statutory term has its common-law meaning." *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 402 (2003). We therefore find it "important to inquire . . . into the common-law meaning of forgery at the time the [1984] statute was enacted." *Gilbert*, 370 U.S. at 655.

Historically, forgery was defined as "the false making, with the intent to defraud, of a document which is not what it purports to be, as distinct from a document which is genuine but nevertheless contains a term or representation known to be false." *United States v. Price*, 655 F.2d 958, 960 (9th Cir. 1981) (Kennedy, J.). In the paradigmatic case of forgery at common law, the instrument "is not what it purports to be" because it purports to be written by someone who did not actually write it. *Greathouse v. United States*, 170 F.2d 512, 514 (4th Cir. 1948) (calling it "well established" that forgery "contemplates a writing which falsely purports to be the writing of another person than the actual maker"). Thus, common-law forgery did not extend to "[t]he mere false statement or

implication of a fact, not having reference to the person by whom the instrument is executed." *Commonwealth v. Baldwin*, 77 Mass. (1 Gray) 197, 198 (1858).

As a consequence, the common-law definition of forgery excluded so-called "false agency endorsements," in which an agent endorses an instrument on his principal's behalf, and signs his own true name, but lacks actual authority to make the endorsement. *Gilbert*, 370 U.S. at 657 (considering several English authorities to the contrary, but finding them not representative of the common-law view of forgery). The agency endorsement rule had its origin in an English case, *Regina v. White*, 175 Eng. Rep. 167, 170 (K.B. 1847), which held that "indorsing a bill of exchange under a false assumption of authority to endorse it per procuration, is not forgery, there being no false making." The idea is that endorsement by an agent who lacks actual authority "inferentially state[s] an untruth," by "imply[ing] that [the agent] had authority to indorse his employer's name to the checks so indorsed and receive the proceeds thereof," but that the writing itself "was not falsely made, in that it purported to be anything different from what it actually was." *Dexter Horton Nat'l Bank of Seattle v. U.S. Fid. & Guar. Co.*, 270 P. 799, 801 (Wash. 1928). The underlying wrong is "not . . . forgery, but a breach of trust." *Abbott v. Rose*, 62 Me. 194, 201 (1873). The rule enjoyed, and continues to enjoy, overwhelming support in the common-law

decisions of federal and state courts.  *See Gilbert*, 370 U.S. at 655–56; *Selvidge v. United States*, 290 F.2d 894, 895–96 (10th Cir. 1961).[2]

Although it was most often applied to false "agency endorsements," the rule followed from the broader common-law principle that "[a] false assertion of authority to write another's name, or to sign his name as agent, by which a person is deceived and defrauded, is not forgery." *Bendit*, 43 P. at 901.  The rule therefore applies not only to endorsements but to any form of unauthorized execution, *see, e.g.*, *Kinder*, 290 S.W. at 130 (making and signing of a check), and to both express and implied assertions of authority to act on behalf of another, *see, e.g.*, *Dexter Horton*, 270 P. at 801 ("directly or by inference");

---

[2]*See also Greathouse*, 170 F.2d at 514; *In re Tully*, 20 F. 812, 814–15 (C.C.S.D.N.Y. 1884); *Int'l Fin. Corp. v. People's Bank of Keyser*, 27 F.2d 523, 526 (N.D. W. Va. 1928); *People v. Cunningham*, 813 N.E.2d 891, 895 (N.Y. 2004) ("Defendant did not commit forgery merely by exceeding the scope of authority delegated by the corporation."); *Nobles v. Marcus*, 533 S.W.2d 923, 926 (Tex. 1976); *Tiarks v. First Nat'l Bank of Mobile*, 182 So. 2d 366, 372–73 (Ala. 1966); *Pasadena Inv. Co. v. Peerless Cas. Co.*, 282 P.2d 124, 125 (Cal. Ct. App. 1955); *Mallory v. State*, 168 S.W.2d 787, 789 (Tenn. 1943); *State v. Lamb*, 152 S.E. 154, 155 (N.C. 1930); *Graham v. State*, 51 S.W.2d 369, 373 (Tex. Crim. App. 1930); *Dexter Horton Nat'l Bank of Seattle*, 270 P. at 801; *Schulte v. State*, 271 P. 1045, 1048 (Okla. Crim. App. 1928); *State v. Kinder*, 290 S.W. 130, 131 (Mo. 1926); *Goucher v. State*, 204 N.W. 967, 968 (Neb. 1925); *State v. Alexander*, 236 P. 542, 543–44 (Mont. 1925); *Barron v. State*, 77 S.E. 214, 217–18 (Ga. Ct. App. 1913); *People v. Bendit*, 43 P. 901, 901 (Cal. 1896); *State v. Taylor*, 16 So. 190, 190 (La. 1894); *State v. Wilson*, 9 N.W. 28, 30 (Minn. 1881); *People v. Mann*, 75 N.Y. 484, 484 (1878); *Abbott*, 62 Me. at 201; *Baldwin*, 77 Mass. (1 Gray) at 198.  This Court also has recognized the related point that, at common law, forgery relates to "genuineness of execution," rather than the truth or falsity of contents.  *Marteney v. United States*, 216 F.2d 760, 763 (10th Cir. 1954).

- 13 -

*Baldwin*, 77 Mass. (1 Gray) at 198 ("statement or implication"). In *Alexander*, 236 P. at 543, for example, the vice president and cashier of a bank were authorized to issue traveler's checks, but "only upon receiving for each check so sold the full amount for which it was made payable." In violation of their instructions and intending to commit fraud, they filled out a $20 check payable to a customer and signed their own names, even though they had not received payment. *Id.* Because "the traveler's check in question was just what it purported to be" and the men "were authorized to sign for the bank," their sole "wrongful act consisted in delivering the check to [the customer] without collecting the specified amount," thereby "violat[ing] their instructions and abus[ing] their authority." *Id.* at 544. "However reprehensible their act," the court held, "it did not constitute forgery within any recognized definition of the term." *Id.* at 545.

One powerful reason for distinguishing between forgery and other breaches of trust is that the bank, not the account holder, generally bears the risk of loss for paying on a forged instrument. That rule originated in another celebrated English decision, *Price v. Neal*, 97 Eng. Rep. 871, 871 (K.B. 1762), in which the forger already had been hanged, and the court was left to determine whether the drawee could recover the value of two payments he made on forged bills of exchange. Lord Mansfield, writing for the court, held that the drawee could not recover because he was in the best position to detect the forged signature of one of his

account holders: "[i]t was incumbent upon the plaintiff, to be satisfied that the bill drawn upon him was [in] the drawer's hand, before he accepted or paid it." *Id.* at 872 (internal quotation marks omitted). The rule of *Price v. Neal* "was adopted wholeheartedly in the nineteenth century in almost all American jurisdictions," and today both at common law and under the Uniform Commercial Code (UCC), banks bear the risk of loss for paying on forged instruments. Christopher M. Grengs & Edward S. Adams, *Contracting Around Finality: Transforming* Price v. Neal *from Dictate to Default*, 89 Minn. L. Rev. 163, 172–79 (2004); *see* UCC § 4-401(a) & cmt. 1 (2002) ("An item containing a forged drawer's signature or forged indorsement is not properly payable.").

Holding banks liable in cases of forgery would make no sense, however, if any check signed by an agent without actual authority qualified as "forged." As one court warned: "To hold the certificate in this case was a forgery because of an alleged excess of authority on the part of the cashier to issue, would be to strike a deathblow to the law of negotiable instruments." *Int'l Fin. Corp.*, 27 F.2d at 528. Banks typically do not know, and cannot easily ascertain, whether an agent privately has received authorization to act on behalf of his principal. *Id.* at 529 (asking, rhetorically, whether a bank must "visit the [principal] itself, confer with its officers and directors, consult by-laws and minutes of the board of directors and of its several committees, in order to ascertain whether there be some want of authority on the part of the [agent]"). Thus, mindful of the implications for

commercial law,[3] courts at common law did not include genuinely executed instruments, whose sole falsehood is an implied misrepresentation of agency, within the definition of forgery.

The common law rarely being neat and uniform, we acknowledge a competing line of cases holding that "an agent may commit forgery by making or signing an instrument in disobedience of his instructions or in the improper exercise of his authority." *Yeager v. United States*, 32 F.2d 402, 402 (D.C. Cir. 1929). We have previously distinguished many of these cases on their facts.[4] *See*

---

[3]The agency endorsement rule also reflects these concerns, as an account holder can easily shift liability for false agency endorsements to the bank by placing a signature card on file for the account. In that case, the bank knows which agents are authorized to write checks, and acts at its peril—not because of forgery but because of a contractual agreement—in paying on a check signed by anyone else. Conversely, the UCC, citing common-law principles, *see* UCC § 3-402(a) (2004), makes clear that the account holder, not the bank, is liable for a check signed by an agent with general check-writing authority who exceeds his contractual authority in writing that particular check:

> Case #2. X is Treasurer of Corporation and is authorized to write checks on behalf of Corporation by signing X's name as Treasurer. X draws a check in the name of Corporation and signs X's name as Treasurer. The check is made payable to X. X then indorses the check and obtains payment. Assume that Corporation did not owe any money to X and did not authorize X to write the check. Although the writing of the check was not authorized, Corporation is bound as drawer of the check because X had authority to sign checks on behalf of Corporation.

*Id.* § 3-405, cmt. 3. The UCC, like the common law, does not treat this set of facts as a case of forgery. *See id.* § 1-201(b)(41) (defining "unauthorized signature" as "includ[ing] a forgery").

[4]*Quick Serv. Box Co. v. St. Paul Mercury Indem. Co.*, 95 F.2d 15, 15–17 (7th Cir. 1938) (defendant obtained checks already signed by his principal, and filled in the blanks to obtain the proceeds himself); *Yeager*, 32 F.2d at 402

*Selvidge*, 290 F.2d at 895–96 & n.2.  Yet a few decisions in this line, including cases from territorial courts, federal district courts, and some state courts, simply cannot be reconciled with the prevailing rule concerning false agency endorsements.[5]  Contemporary sources recognized that these decisions were badly outnumbered.  *See* Annotation, *Genuine Making of Instrument for Purpose of Defrauding as Constituting Forgery*, 41 A.L.R. 229 (1926) (describing these cases as representing a "minority view," at odds with "the better view . . . supported by the majority opinion"); *State ex rel. Nesbitt v. Liberty Nat'l Bank & Trust Co. of Okla. City*, 414 P.2d 281, 286 (Okla. 1966) (noting that the prevailing rule had been adopted in "the vast majority of jurisdictions in this country"); *Tiarks*, 182

(defendant endorsed checks using his employer's name, not his own, and deposited them in his own account); *In re Clemons*, 151 N.E.2d 553, 555 (Ohio 1958) (defendant signed a check using his own name, but purported to draw funds from a nonexistent, fictitious bank account); *People v. Kubanek*, 19 N.E.2d 573, 573–74 (Ill. 1939) (defendant obtained checks already signed by his principal, for payment of her expenses, but filled in the blanks making them payable to himself); *State v. Sotak*, 131 S.E. 706, 707 (W. Va. 1926) (defendant signed his own name and the name of his partner, not as his partner's agent but side-by-side, making the check appear to have been signed by both); *Kimmel v. State*, 156 N.W. 1074, 1075 (Neb. 1916) (defendant had authority to make duplicates of instruments, imitated the signatures, and passed off the duplicates as originals); *Moore v. Commonwealth*, 18 S.W. 833, 833 (Ky. Ct. App. 1892) (defendant signed the name of the clerk of court, not his own name, to a false witness certificate); *State v. Kroeger*, 47 Mo. 552, 562–63 (1871) (defendant obtained checks already signed by his principal, added the words "cash or bearer," and deposited the funds into his own account).

[5]*See People v. Susalla*, 220 N.W.2d 405, 406 (Mich. 1974); *Territory v. Forrest*, 27 Haw. 209, 211–12 (1923); *United States v. Hartman*, 65 F. 490, 491 (E.D. Mo. 1894); *Ex parte Hibbs*, 26 F. 421, 432–33 (D. Or. 1886); *People v. Dickie*, 17 N.Y.S. 51, 52–53 (N.Y. Gen. Term 1891).

So. 2d at 370 (refusing to adopt the "minority view"); *Mallory*, 168 S.W.2d at 789 (declining to "depart from the majority holding that mere deceit as to agency, or authority to endorse, does not constitute forgery"); *Goucher*, 204 N.W. at 968 (noting that "[t]he decisions are nearly unanimous" in favor of the prevailing rule). Accordingly, in reviewing the case law, both the Supreme Court and this Court have discounted these "scattered" cases, holding instead that common-law forgery excluded instruments signed by an agent using his own name, but written in excess of actual authority. *Gilbert*, 370 U.S. at 658; *Selvidge*, 290 F.2d at 896 n.2.

In this case, Mr. Hunt's actions do not fit the common-law definition of forgery. Mr. Hunt signed each of the 65 checks using his own true name. Although the checks "inferentially state an untruth" by implying that Mr. Hunt had been authorized by Orienta to write checks to B&H Special or B-H Inc., they were genuinely executed, not "falsely made," because they do not purport to be anything other than checks written by an Orienta agent. *Dexter Horton*, 270 P. at 801. The underlying wrong is not forgery, but a breach of trust.

The district court noted that Mr. Hunt signed only his own name, rather than signing his employer's name and adding, "by Gregory Hunt, its manager." As a result, it concluded, this case differs from *Gilbert* and *Selvidge*, where "it was clear from the four corners of the check that [the check] had been endorsed by an agent." App. 274. We accepted a similar argument—essentially, that to

avoid liability the instrument must be signed by an agent, *as an agent*—in *United States v. Jaynes*, 75 F.3d 1493, 1500–01 (10th Cir. 1996) (construing 18 U.S.C. § 510(a)), where the defendant endorsed a series of treasury checks payable to her deceased grandmother by signing two names, her grandmother's and her own, and using a "stylized signature" for one of them. The rule concerning agency endorsements did not apply, we explained, because nothing on the face of the check suggested that she had signed as her grandmother's agent. *Id.* at 1501. To the contrary, because the names had been deliberately signed using two different handwriting styles, "it appeared that they had been endorsed by two different people." *Id.* The forgery in that case was the defendant's forgery of her grandmother's name, not of her own as agent for the grandmother.

In this case, by contrast, it was unmistakably clear that Mr. Hunt had signed as Orienta's agent. Each of the checks prominently displayed Orienta's name and address, and Mr. Hunt signed all sixty-five checks on a signature block labeled "AUTHORIZED SIGNATURE." *See, e.g.*, App. 1256. On many of the checks, Orienta's name was reprinted directly above the "authorized signature" line, reinforcing that Mr. Hunt claimed to be "authorized" by Orienta. Further, Mr. Hunt *was* authorized to write checks on behalf of Orienta; his name appeared on the signature cards for the two Orienta accounts from which the checks were drawn. Both banks and all parties to the transactions therefore knew that Mr. Hunt routinely wrote checks as Orienta's agent for the account numbers listed on

the instruments. *See Alexander*, 236 P. at 544 (finding no forgery where the bank's agents had signed their own names, not the bank's, because they were "authorized to sign for the bank" but had exceeded the scope of that authority). Under the circumstances, we cannot agree with the district court that "there was no indication on the checks that Defendant was acting as an agent." App. 275.

Because forgery at common law depends on genuineness of execution, and does not extend to an agent's false assertion of authority to act on behalf of his principal, Mr. Hunt did not utter "forged" securities according to the common-law definition.

### B. "Forged" Securities Under § 513(c)(2)

Although the common law of forgery supplies important background interpretive principles, the question in this case is whether the checks signed by Mr. Hunt were "forged" within the meaning of § 513(a). The statute expressly defines that term in § 513(c)(2): "'forged' means a document that purports to be genuine but is not because it has been falsely altered, completed, signed, or endorsed, or contains a false addition thereto or insertion therein, or is a combination of parts of two or more genuine documents." Particularly where Congress has supplied its own statutory definition of a term, we cannot presume that Congress meant simply to codify the common-law meaning. *See Gilbert*, 370 U.S. at 658–59 ("Of course, Congress could broaden the concept of 'federal' forgery by statutory definition."). To determine the scope of the statute, we must

- 20 -

therefore "look first to its language, giving the words used their ordinary meaning." *Moskal*, 498 U.S. at 108 (internal quotation marks and citations omitted).

Like the scarecrow in *The Wizard of Oz*, the Supreme Court decisions construing federal forgery statutes, *Gilbert* and *Moskal*, point in two different directions. In *Gilbert*, the Court reversed a conviction under 18 U.S.C. § 495, which provides for criminal sanctions against "[w]hoever falsely makes, alters, forges, or counterfeits" certain writings for purposes of obtaining money from the United States. *Gilbert*, 370 U.S. at 659. The defendant, an accountant and tax preparer, had endorsed two government refund checks by signing the name of his clients and then signing his own name, "R. Milo Gilbert, Trustee." *Id.* at 651. According to the clients, the defendant was not authorized to endorse checks on their behalf. *Id.* at 652. Noting that "in the absence of anything to the contrary it is fair to assume that Congress used [the] word ['forges'] in its common-law sense," the Court scoured the common law and determined, notwithstanding "scattered" authorities to the contrary, that agency endorsements made without actual authority did not qualify as "forgery." *Id.* at 655–58 (adopting the reasoning of *Selvidge*, 290 F.3d at 896).

In *Moskal*, on the other hand, the Court upheld a conviction under 18 U.S.C. § 2314, which criminalizes the transportation in interstate commerce of "any falsely made, forged, altered, or counterfeited securities or tax stamps,

knowing the same to have been falsely made, forged, altered, or counterfeited." *Moskal*, 498 U.S. at 106. The defendant had participated in a "title-washing" scheme in which he received vehicle titles that contained false mileage figures. *Id.* at 105. Renouncing any reliance on the common law, the majority held that the words "falsely made" in the statute "are broad enough, on their face, to encompass washed titles containing fraudulently tendered odometer readings" because such titles "are made to contain false, or incorrect, information." *Id.* at 108–09, 114. Any other construction would fail "to give *any* meaning to this phrase independent of other terms in § 2314, such as 'forged' or 'counterfeited.'" *Id.* at 109. Over a vigorous dissent by Justice Scalia, and explicitly rejecting this Court's decision in *United States v. Sparrow*, 635 F.2d 794 (10th Cir. 1980) (en banc), the majority found that there was no "'established' meaning of 'falsely made' at common law" because "there were divergent views on this issue." *Id.* at 114–15. Moreover, the majority concluded, a broad reading of "falsely made" would effectuate Congress's purpose by helping to curb interstate trafficking in fraudulent securities. *Id.* at 110.

For several reasons, *Moskal* does not control the outcome in this case. First, and most obviously, *Moskal* involved a different statute and a different statutory term: "falsely made," not "forged." Indeed, the Court in *Moskal* adopted an expansive definition precisely because it sought to differentiate "falsely made" from "forged." *See id.* at 109. Second, the facts of *Moskal* are

- 22 -

readily distinguishable. In *Moskal*, the vehicle titles were "falsely made" because they contained express false statements. *Id.* at 104. Here, by contrast, the government concedes that "[t]here is nothing false about the 'content' of any of the 65 checks." Gov't Br. 17. The government's own witness testified that Mr. Hunt had written "true check[s]." App. 917. The facts of this case bear a closer resemblance to those in *Gilbert*, where the Court held that the defendant had not committed "forge[ry]" because he merely lacked authority to sign checks as an agent for his clients. *Gilbert*, 370 U.S. at 659. Third, the definition of "forged" in § 513(a) uses the words "genuine" and "falsely . . . completed," as to which *Moskal* provides limited guidance.

Nonetheless, recognizing that *Moskal* represents the Supreme Court's latest pronouncement on the general subject, this Court on at least one occasion has followed its interpretive approach in construing a federal forgery statute. In *United States v. Cowan*, 116 F.3d 1360, 1362–63 (10th Cir. 1997), we held that 18 U.S.C. § 505, which makes it a crime to "forge[]" the signature of a federal judge, does not contain an "intent to defraud" requirement, notwithstanding the uniform presence of such a requirement at common law. We based that decision on the ordinary meaning of the text of § 505, which contains no intent-to-defraud language, in stark contrast with other criminal statutes in Chapter 25 of Title

18—including twenty statutes and four forgery statutes—that expressly require "intent to defraud." *Id.* at 1363.[6]

We again undertake a close textual reading here. Section 513(c)(2) defines "forged" as "a document that purports to be genuine but is not because it has been falsely . . . completed." The government contends that the 65 checks were "falsely completed" because Mr. Hunt exceeded his authority: he wrote checks to B&H Special and B-H Inc., rather than legitimate creditors of Orienta. If the statutory definition extended to all "falsely completed" securities, we might well deviate from the common-law definition and accept the government's position. Just as documents "made to contain false, or incorrect information" were deemed "falsely made" in *Moskal*, 498 U.S. at 109, check blanks filled out so as to contain false implied assertions of authority arguably are "falsely completed" within the ordinary meaning of those words.

But § 513(a) does not treat all "falsely completed" securities as "forged." The statute defines "forged" as "a document that *purports to be genuine but is not* because it has been falsely altered, completed, signed, or endorsed, or contains a false addition thereto or insertion therein, or is a combination of parts of two or more genuine documents." 18 U.S.C. § 513(c)(2) (emphasis added). The

---

[6]We also noted that "[t]he purpose of § 505 is to protect the reputation and integrity of the federal courts," not "to outlaw a narrow category of fraud," and held that requiring intent to defraud risked defeating Congress's purpose. *Id.* We consider Congress's purpose in enacting § 513(a) in Part II.C, *infra*.

- 24 -

definition thus contains two requirements: first, the document must "purport[] to be genuine," but in fact be non-genuine; and second, the *reason* for the document's non-genuine character must be one of those listed in the statute—for example, "because it has been falsely . . . completed." Congress did not need to add the words "purports to be genuine but is not" if it meant to encompass any document that is "falsely . . . completed" within the definition. This conclusion is reinforced by § 513(c)(1), which employs the same structure as § 513(c)(2), and defines "counterfeited" as "a document that purports to be genuine but is not, because it has been falsely made or manufactured in its entirety." Under both provisions, a security must be non-genuine; the difference lies only in the reasons for describing it that way. *Cf. United States v. Pullman*, 187 F.3d 816, 822–23 (8th Cir. 1999) (rejecting a defendant's construction of "counterfeited" in § 513(a) because it would effectively collapse the definitions of "counterfeited" and "forged" in § 513(c)).

Although the statute defines neither "genuine" nor its opposite, we have no doubt that the checks written by Mr. Hunt qualify as genuine, and therefore not forged. In ordinary usage, when describing an instrument, "genuine" means "actually produced by or proceeding from the reputed or alleged source or author." Webster's Third New International Dictionary 948 (2002) (giving the examples "a genuine signature" and "a genuine text"). More broadly, the term may apply to "anything that is really what it is claimed or represented to be."

New Oxford American Dictionary 703 (2d ed. 2005) (usage note) (giving the example "genuine leather"). "Genuine" is not synonymous with "true"; to describe something as "not genuine" is to denote a particular kind of falsehood, relating to what the thing is or who produced it. In this case, Mr. Hunt signed all 65 checks using his own true name, and he was the actual source or author. The instruments "purport[] to be" checks written by Mr. Hunt as an agent for Orienta, and that is precisely what they are. Although Mr. Hunt exceeded his authority as Orienta's manager by writing checks to noncreditors, that fact goes to whether the instruments are "falsely completed," not whether they are "genuine." The checks therefore do not fit within the statutory definition of a forged security.

Moreover, common-law forgery cases consistently use the word "genuine" to refer to genuineness of execution or authorship, not authority to act as an agent for another.[7] Indeed, the statutory phrase as a whole—"purports to be genuine but

---

[7] *See Int'l Fin. Corp.*, 27 F.2d at 526 (holding that an agent "cannot have committed a forgery in executing and issuing the certificates of deposit in misuse of his authority, if in fact his signature is genuine, and what it purported to be"); *Mallory*, 168 S.W.2d at 789 ("The fraud, if any, consisted in inducing confidence in the validity of the agency, and no intended deceit as to the genuineness of the instrument itself."); *Dexter Horton*, 270 P. at 801 (holding that forgery "excludes a genuine writing; that is, a writing which is just exactly what it purports to be," and that a false agency endorsement did not "purport[] to be anything different from what it actually was"); *Bendit*, 43 P. at 901 ("There must be a design to pass as the genuine writing of another person that which is not the writing of such other person."); *Wilson*, 9 N.W. at 29 (holding that forgery requires an instrument that is "not genuine—an instrument by which some one has attempted to imitate another's personal act," as opposed to "the doing of something in the name of another").

is not"—tracks so closely with the common-law formulation that it appears to simply codify that aspect of the common-law definition. *See, e.g.*, *Ex parte Finley*, 5 P. 222, 262 (Cal. 1884) (noting that forgery requires "a writing—such as can be the subject of forgery—not genuine, but purporting to be genuine"). Thus, just as forgery at common law excludes false agency endorsements precisely because they are "genuine," the statutory definition of "forged" in § 513(c)(2) excludes false agency endorsements as "genuine" documents.

Our interpretation finds support from the only other federal court to construe the term "forged" in § 513(a). In *United States v. Young*, 282 F.3d 349, 352 (5th Cir. 2002), the Fifth Circuit found "[n]othing [to] suggest[] that Congress intended to depart from the settled meaning of 'forgery' in enacting § 513." Surveying the case law and concluding that "[a]t common law and in state forgery statutes, 'forgery' always includes signing one's own name with the intent of having the signature taken as that of another person with the same name," the court upheld a conviction based on those facts under the statute. *Id.* at 351, 353. In a footnote, the court even anticipated the facts of Mr. Hunt's case, noting that because of the common-law rule, there would no violation of § 513(a) "when an agent signs a company check without actual authority to do so." *Id.* at 351 n.1.

We agree that the statutory definition of "forged" in § 513(c)(2) does not deviate meaningfully from the common-law definition. Thus, on a close reading of the text, the checks written by Mr. Hunt do not qualify as "forged."

### C. Legislative History of § 513(a)

Having concluded that the common-law definition of forgery excludes Mr. Hunt's conduct and the text of the statutory definition of "forged" is consistent with that definition, we turn to the legislative history of § 513. We recognize that it is not necessary to resort to legislative history when statutory language is unambiguous. *See United States v. Prosperi*, 201 F.3d 1335, 1343 (11th Cir. 2000) (finding the statutory definition of "counterfeited" in § 513(a) unambiguous and therefore discounting legislative history to the contrary). But the language of this statute is sufficiently technical, and the Supreme Court's interpretations of similar statutory language in *Gilbert* and *Moskal* sufficiently conflicting, that we find it useful to examine the legislative history to ensure that our interpretation is "supported by Congress's purpose in enacting [§ 513]," as the Supreme Court did in *Moskal*, 498 U.S. at 110.

The legislative history of the Comprehensive Crime Control Act of 1984 says little about § 513, noting simply that the provision "would remedy a gap in existing statutes relating to the forging of endorsements on United States securities." *See* S. Rep. No. 98-225, at 371–72 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3512–13. Yet it cross-references an earlier Senate committee report concerning the never-enacted Criminal Code Reform Act of 1981. *Id.* at 371 n.1, 1984 U.S.C.C.A.N. at 3512 n.1 (citing S. Rep. No. 97-307 (1981) ("the 1981 Senate report")). Because that report includes a detailed discussion of

language virtually identical to the text of § 513, and the earlier bill "gave impetus to the enactment of § 513," *United States v. Pebworth*, 112 F.3d 168, 172 (4th Cir. 1997) (Murnaghan, J., dissenting), courts have treated the 1981 Senate report as the authoritative legislative history of § 513. *See Prosperi*, 201 F.3d at 1343.

The 1981 Senate report confirms that Congress did not intend for § 513(a) to reach instruments signed by an agent using his own name, where the sole falsehood is an implied assertion of authority to act on behalf of another. First, the report states unequivocally that "[t]he term 'genuine' refers to the validity of the execution of the written instrument," S. Rep. No. 97-307, at 776 n.54, consistent with the ordinary meaning of that term. Second, the report not only expressly adopts the common-law rule concerning false agency endorsements, but links that rule to the statutory term "genuine":

> [Section 513] is not intended to cover 'false agency' signatures and endorsements and thus continues the rule that the term 'forgery' does not cover the situation where a person signs an instrument purporting on its face to be signed by him as an agent, when, in fact, he has no authority to sign such instrument. The reason for not including such conduct within this section is that, as the person executing the instrument signs his true name, the execution of the instrument is, in fact, genuine, unlike forgery where there is no genuine execution.

*Id.* at 777–78 (footnotes omitted) (citing with approval both *Gilbert* and *Selvidge*). In that situation, the report explains, "the falsity lies not in the execution of the written instrument but rather in the representation of a non-existent authority." *Id.* at 778. Third, the report states that "[t]he purpose of this

- 29 -

section . . . is the protection of the integrity of written instruments and not the punishment of fraudulent conduct in general." *Id.*

Here, all 65 checks written by Mr. Hunt were genuinely executed. He signed them using his own name, and the instruments unmistakably identify him as an "authorized agent" of Orienta. The falsity of the checks lies only "in the representation of a non-existent authority." *Id.* According to the 1981 Senate report, Congress consciously elected not to make such conduct punishable as forgery under § 513. Further, neither of the purposes identified in the legislative history—closing gaps in federal law against forgery of U.S. securities and protecting the integrity of written instruments—bespeaks a congressional purpose to punish embezzlement, breaches of trust, or other "fraudulent conduct in general" as forgery under § 513(a). *Id.*

Because the common law, the text, and the legislative history all compel the conclusion that the checks were not "forged" within the meaning of § 513(a), Mr. Hunt is not guilty of uttering forged securities as a matter of law. The money laundering charges, which depend on some underlying unlawful action, also cannot be sustained. We need not consider the other issues on appeal.

### III. Conclusion

We pause to acknowledge our distaste for undoing the conviction of a defendant twice found guilty of forgery, whose actions undoubtedly violated numerous fraud and embezzlement statutes, and whose conduct before the district

court included the brazen fabrication of evidence and attempted bribery of a witness. It is our unhappy duty, however, to reverse the conviction of any defendant charged under the wrong statute. As the Nebraska Supreme Court noted in one of the leading common-law forgery cases, "even a knave is protected in prosecutions under legislative enhancements authorizing punishments for different species of fraudulent acts such as forgery, obtaining money by false pretenses, larceny and embezzlement." *Goucher*, 204 N.W. at 968. It found, as we do: "There is no escape from this conclusion." *Id.* at 969.

We **REVERSE** the conviction and **REMAND** the case with instructions to enter a judgment of acquittal.

05-6023, <u>United States v. Hunt</u>

**BRISCOE, Circuit Judge, concurring**:

I concur in Parts I, II.B and III of the majority's opinion, as well as the judgment. I decline to join Parts II.A and II.C, however, because the unambiguous language of 18 U.S.C. § 513(a) makes it unnecessary to resort to review of the legislative history or common-law definitions of "forgery." <u>See generally</u> <u>Lamie v. U.S. Tr.</u>, 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text," and "when the statute's language is plain, the sole function of the courts–at least where the disposition required by the text is not absurd–is to enforce it according to its terms"); <u>Hoffman v. Conn. Dep't of Income Maint.</u>, 492 U.S. 96 (1989) ("If congressional intent is unmistakably clear in the language of the statute, reliance on committee reports and floor statements will be unnecessary . . . .").

Where, as here, we are asked to interpret a statute which contains an express definition of the term at issue, our task is made easier. And, as the majority states, "[p]articularly where Congress has supplied its own statutory definition of a term, we cannot presume that Congress meant simply to codify the common-law meaning." Maj. Op. at 21. Further, "'[w]hen the meaning of the statute is clear, it is both unnecessary and improper to resort to legislative history to divine congressional intent.'" <u>United States v. Ortiz</u>, 427 F.3d 1278, 1282 (10th Cir. 2005) (quoting <u>Edwards v. Valdez</u>, 789 F.2d 1477, 1481 (10th Cir. 1986)).

I am content in this case to rely on the statutory language to determine whether Mr. Hunt committed the crimes charged. When the acts committed by Mr. Hunt are reviewed through that lens, the government has failed to establish the documents at issue here were "forged" as defined by 18 U.S.C. § 513. <u>See</u> Maj. Op. at 24-26.