# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>April 1, 2019</u>

**NOS. A-1-CA-35193 and A-1-CA-35225**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.

**KARL CANDELARIA,**

     Defendant-Appellant,

and

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.

**NORA CHEE,**

     Defendant-Appellant.

**APPEALS FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Christina P. Argyres, District Judge**

Hector H. Balderas, Attorney General
Anita Carlson, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
J.K. Theodosia Johnson, Assistant Appellate Defender
Santa Fe, NM

for Appellant Karl Candelaria

Jonathan Tsosie
Denver, CO

Ben A. Ortega
Albuquerque, NM

for Appellant Nora Chee

**OPINION**

**KIEHNE, Judge Pro Tempore.**

{1}     Defendants Nora Chee and Karl Candelaria each appeal from separate judgments and sentences following a jury verdict finding them both guilty of fraud, forgery, and conspiracy to commit fraud, and Defendant Chee guilty of embezzlement, arising from a scheme in which they stole over $200,000 from the franchisor of Defendant Chee's business by writing unauthorized checks to themselves. Because the two cases arise from the same facts, and Defendants raise similar claims, we consolidate these cases for decision. *See* Rule 12-317(B) NMRA.

{2}     Defendants make the following claims on appeal: (1) that the evidence was insufficient to support their convictions for forgery, because the checks and signature stamp that they used to carry out their scheme were authentic, even though their use of those items was unauthorized; (2) that the district court erred in denying their motions to dismiss the charges against them on speedy trial grounds on the stated basis that the motions were filed after the deadline for filing pretrial motions in the district court's scheduling order; (3) that the district court erred when it allowed late-disclosed evidence to be used at trial and did not grant a continuance to allow Defendants to further investigate it; (4) that the district court erred when it allowed a substitute witness to testify as a records custodian; and (5)

that the district court erred in allowing a variety of unfairly prejudicial evidence to be admitted at trial. Defendant Candelaria also challenges his two convictions for fraud, arguing that they violate his right to be free from double jeopardy. We agree that Defendant Candelaria's two fraud convictions violate the prohibition on double jeopardy, and remand to the district court with instructions that one of the convictions be vacated. We affirm the district court's judgments and sentences in all other respects.

**BACKGROUND**

{3}     Defendant Chee owned a business called Care Connections, which was a franchise of Around the Clock Healthcare Services (ATC), a medical staffing company based in New York. Care Connections, as a franchisee of ATC, provided Registered Nurses (RNs), Licensed Practical Nurses (LPNs), and various other healthcare workers to healthcare facilities in need of temporary staff. Ms. Chee was also an RN. Chee's boyfriend, Defendant Candelaria, was an employee of Care Connections, where he performed administrative tasks. He was not an RN, nor was he an employee of ATC.

{4}     ATC offered a program called the "daily pay program" or "quick pay program," which allowed RNs to submit a timesheet verifying the work that they had done for a healthcare facility, and be paid by ATC that same day rather than having to wait until the end of the next pay period. ATC provided its franchisees,

including Defendant Chee's franchise, with check stock and the signature stamp of ATC's Chief Financial Officer, David Kimbell, to facilitate the quick pay program. ATC placed firm restrictions on Defendant Chee's ability to use the signature stamp and check stock: she was authorized to issue checks only to RNs, for amounts of $500 or less, with a limit of one check per person per day. As a principal of the franchise, Defendant Chee was not authorized to issue quick pay checks to herself, even for services she rendered as an RN. Defendant Candelaria was not entitled to receive quick pay checks, because he was not an RN, and thus could not have provided any services that would have entitled him to receive a quick pay check.

{5}    Mr. Kimbell and David Savitsky, the Chief Executive Officer of ATC, discovered in 2009 that Care Connections had issued a number of quick pay checks to Defendants Chee and Candelaria in 2008 and 2009, in amounts totaling over $200,000. No documentation established that Defendants performed any work to justify the issuance of those checks. The checks were deposited into two different bank accounts that Defendant Chee had opened, and the money was often quickly withdrawn. Defendant Chee was the only person authorized to make withdrawals from those accounts. During the relevant time period, Defendant Chee also wrote checks for large amounts of money from those accounts to Defendant Candelaria.

3

{6} Both Defendants were arrested on June 3, 2011, and charged with multiple counts of forgery ($2500 or less), contrary to NMSA 1978, Section 30-16-10(A), (B) (2006); conspiracy to commit forgery, contrary to Section 30-16-10(A), (B) and NMSA 1978, Section 30-28-2 (1979); and fraud (between $2,500 and $20,000), contrary to NMSA 1978, Section 30-16-6 (2006); plus one count of conspiracy to commit fraud (between $2,500 and $20,000), contrary to Section 30-16-6 and Section 30-28-2. The State also charged Defendant Chee with multiple counts of embezzlement, contrary to NMSA 1978, Section 30-16-8 (2007), and Defendant Candelaria with one count of fraud (over $20,000), contrary to Section 30-16-6. The district court consolidated Defendants' cases for trial, and Defendant Chee was convicted of twenty-two counts of forgery, one count of embezzlement, one count of fraud, and one count of conspiracy to commit fraud. Defendant Candelaria was convicted of ten counts of forgery, two counts of fraud, and one count of conspiracy to commit fraud.

**DISCUSSION**

**I.     Substantial Evidence Supported Defendants' Forgery Convictions**

{7} Defendants claim that substantial evidence did not support their forgery convictions. Specifically, Defendants contend that their conduct did not constitute the crime of forgery because the quick pay checks and signature stamp used in the

4

scheme were genuine, and Defendant Chee endorsed the checks with her own genuine signature. We disagree.

**{8}** "Although framed as a challenge to the sufficiency of the evidence, Defendant[s'] argument requires us to engage in statutory interpretation to determine whether the facts of this case, when viewed in the light most favorable to the verdict, are legally sufficient to sustain" their convictions for forgery, and we therefore apply de novo review. *See State v. Barragan*, 2001-NMCA-086, ¶ 24, 131 N.M. 281, 34 P.3d 1157, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110.

**{9}** "Forgery consists of falsely . . . making or altering any signature to, or any part of, any writing purporting to have any legal efficacy with intent to injure or defraud; or knowingly issuing or transferring a forged writing with intent to injure or defraud[.]" Section 30-16-10(A)(1). "Forgery has been defined as a crime aimed primarily at safeguarding confidence in the genuineness of documents relied upon in commercial and business activity." *State v. Baca*, 1997-NMSC-018, ¶ 5, 123 N.M. 124, 934 P.2d 1053. Forgery "requires a lie," but "it must be a lie about the document itself: the lie must relate to the genuineness of the document." *Id.* Indeed, as Defendants correctly observe, New Mexico case law interpreting our forgery statute has long recognized a distinction between a document "which is not genuine" (which can form the basis of a forgery conviction), and a genuine

document "the contents or allegations of which are false" (which cannot). *Territory v. Gutierrez*, 1906-NMSC-003, ¶ 5, 13 N.M. 312, 84 P. 525. The Supreme Court of the United States has also recognized the same historic distinction in the law of forgery. *See Gilbert v. United States*, 370 U.S. 650, 658 (1962) ("Where the 'falsity lies in the representation of facts, not in the genuineness of execution,' it is not forgery."); *see also Moskal v. United States*, 498 U.S. 103, 119 (1990) (Scalia, J., dissenting) ("A forged memorandum is 'falsely made'; a memorandum that contains erroneous information is simply 'false.' ").

{10} Attempting to seize upon that distinction, Defendants argue that the checks at issue in this case merely "told lies" by, in effect, falsely representing that Defendants were entitled to deposit the checks, but "were not lies in and of themselves" because both the checks and the signature stamp were genuine. In response, the State, while not disputing that the checks and the signature stamp were genuine, argues instead that Defendants' use of them beyond ATC's authorization to do so constitutes forgery.

{11} We conclude that the jury could properly find that Defendants committed forgery. Although the checks themselves and the signature stamp were genuine, our appellate courts have long held that a defendant may commit forgery by signing another person's name without authority and, conversely, that signing another's name with authorization is not forgery. *See State v. Smith*, 1927-NMSC-

6

012, ¶ 7, 32 N.M. 191, 252 P. 1003 (holding that an indictment's allegation that the defendant committed forgery by "falsely" signing another's name sufficiently alleged that the defendant signed the name without authority to do so); *State v. Lopez*, 1969-NMCA-115, ¶¶ 13-16, 81 N.M. 107, 464 P.2d 23 (concluding that the defendant was properly convicted of forgery for attempting to cash a check made out to another person and endorsing that person's name without authorization), *overruled on other grounds by State v. Ruffins*, 1990-NMSC-035, ¶ 17, 109 N.M. 668, 789 P.2d 616; *State v. Saavedra*, 1979-NMCA-096, ¶¶ 10-12, 93 N.M. 242, 599 P.2d 395 (holding that the defendant was properly convicted of forgery for signing account holder's name to stolen checks); *cf. Clark v. State*, 1991-NMSC-079, ¶ 12, 112 N.M. 485, 816 P.2d 1107 ("It is clear, we think, that 'wherever authority is given to sign the name of another to a writing, there can be no forgery.' " (quoting 36 Am. Jur. 2d *Forgery* § 9 (1968))).

{12}   In sum, whether a defendant signs another's name by hand, or uses a signature stamp, his or her actions tell a lie about the document itself—that it has been made with the approval of the apparent signer, and is therefore genuine—and does not merely tell a lie about a fact or facts stated in the document. We therefore conclude that Defendants' use of a signature stamp and the checks outside the scope of their authorization to do so were acts which, when combined with the required intent to injure or defraud, constituted forgery.

7

{13} Defendants rely on several cases in support of their contrary position, but all of them are distinguishable. *See State v. Carbajal*, 2002-NMSC-019, 132 N.M. 326, 48 P.3d 64; *Gutierrez*, 1906-NMSC-003; and *State v. Leong*, 2017-NMCA-070, 404 P.3d 9, *cert. denied*, 2017-NMCERT-___ (No. S-1-SC-36576, Aug. 18, 2017). Each of the cited cases held only that a defendant's act of signing his *own* name does not support a forgery conviction. *See Carbajal*, 2002-NMSC-019, ¶¶ 18-19 (stating that the defendant did not commit forgery by signing his own name to another person's traveler's check); *Gutierrez*, 1906-NMSC-003, ¶¶ 1, 4, 9 (holding that a notary public could not be guilty of forgery for signing his own name to a certificate of acknowledgement that contained false statements); *Leong*, 2017-NMCA-070, ¶ 16 (reversing the defendant's conviction for forgery based upon the act of signing his own name to an affidavit of residency that contained a false statement).

{14} Defendant Candelaria's reliance on *United States v. Hunt*, 456 F.3d 1255 (10th Cir. 2006), is similarly misplaced. In that case, the defendant had check-writing authority for his employer, but exceeded that authority by personally signing checks totaling over $2 million to false payees that he controlled, and then using the money for his own purposes. *Id.* at 1256-57. The Tenth Circuit held that this misconduct did not constitute forgery because the defendant "signed each of the 65 checks using his own true name," and thus the checks "were genuinely

8

executed, not 'falsely made,' because they do not purport to be anything other than checks written by an . . . agent [of the defendant's employer]." *Id.* at 1263. In explaining its decision, the Tenth Circuit said that "common-law forgery cases consistently use the word 'genuine' to refer to genuineness of execution or authorship, not authority to act as an agent for another[,]" *id.* at 1267, and Defendant Candelaria concludes from this statement that his (and Defendant Chee's) lack of authority to sign the checks with Mr. Kimbell's signature stamp did not constitute forgery. But *Hunt* is unavailing because the defendant in that case signed his own name, and thus his execution of the checks was genuine in the sense that he was the true signer, albeit one acting beyond the authority that his employer gave to him. Here, by contrast, Defendants used another person's signature stamp to sign the checks without authority to do so, conduct which constitutes forgery under New Mexico law. The Tenth Circuit itself has recognized that an agent commits forgery if he or she signs the principal's name without authority to do so. *See Selvidge v. United States*, 290 F.2d 894, 895 (10th Cir. 1961) (holding that the defendant, who, without authority, endorsed her employer's checks "as the agent of her named principal" did not commit forgery, but observing that if she had signed the name of her principal without authority to do so, "the crime of forgery would have been complete").

9

{15}    Defendant Candelaria also relies on language in *Hunt* indicating that because banks are generally liable if they pay on a forged check, and are rarely aware of private limitations on an agent's authority, "[h]olding banks liable in cases of forgery would make no sense . . . if any check signed by an agent without actual authority qualified as 'forged.' " 456 F.3d at 1262. Again, Defendant Candelaria's reliance on *Hunt* is unavailing. First, we reject any argument that Defendants should escape punishment for their wrongful conduct merely because a third party may ultimately be responsible for satisfying the victim's financial loss resulting from that wrongful conduct. Moreover, the quoted language appears in the portion of the *Hunt* opinion in which the Tenth Circuit was discussing the early development of the common-law crime of forgery, and is difficult to reconcile with the present-day reality that banks are not automatically liable for paying out on forged checks. Under New Mexico's version of the Uniform Commercial Code, a bank's customers have a duty to examine their statements and promptly notify the bank of any unauthorized payments. *See* NMSA 1978, § 55-4-406(c) (1992). A customer's failure to do so constitutes a defense to a claim that the bank improperly paid on a forged check. *See* § 55-4-406(d), (e) (stating that a customer who does not exercise reasonable promptness in examining statements for unauthorized payments may be precluded from recovering from the bank).

10

{16} Finally, contrary to Defendant Chee's assertion, *State v. Deutsch*, 1985-NMCA-123, 103 N.M. 752, 713 P.2d 1008, does not advance her cause. Chee relies on *Deutsch's* statement that where an agent with a "general power" to act for his principal endorses his principal's name, that is not forgery because the endorsement is fully effective, *see id.* ¶ 53, and argues that she did not commit forgery because she had authority to act for ATC. Careful analysis reveals that the language in *Deutsch* that Chee now relies on was non-binding dicta. The defendant in *Deutsch* was not an agent who had a general power to sign for his principal, but endorsed and cashed checks belonging to a company that he once fully controlled but had since been placed in trusteeship. *Id.* ¶¶ 2-8. He was convicted on multiple counts of forgery, and this Court reversed the forgery convictions that were based on checks on which the defendant had signed his own name, but upheld the forgery convictions relating to checks on which the defendant falsely signed the trustee's name. *Id.* ¶¶ 48, 54-56. Quite simply, *Deutsch* did not hold that a defendant's act of signing another person's name without authorization cannot support a forgery conviction.

**II.  The District Court Did Not Err in Denying Defendants' Speedy Trial Motions as Untimely Filed**

{17} Defendants claim that the district court erred by summarily denying their speedy trial motions on the ground that they were filed after the deadline for pretrial motions set forth in the district court's scheduling order. We disagree.

11

**{18}** We apply a de novo standard of review in deciding whether the district court had the legal authority to require that a motion to dismiss on speedy trial grounds be filed by a certain date before trial. *See State v. Foster*, 2003-NMCA-099, ¶ 6, 134 N.M. 224, 75 P.3d 824 ("We review de novo questions of law concerning the interpretation of Supreme Court rules and the district court's application of the law to the facts of this case.").

**{19}** The Local Rules of the Second Judicial District Court required the district court to enter a scheduling order with a pretrial motions deadline. While these cases were pending, our Supreme Court implemented a case management pilot program, Rule LR2-400 NMRA (2014), in the Second Judicial District Court.[1] Because Defendants' cases were pending on June 30, 2014, they were assigned to a "special calendar." *See* LR2-400(B)(1), (L). In turn, LR2-400.1[2] governed the process for cases on the special calendar, but those cases were subject to the same sanctions for failure to comply with time limits as those under LR2-400. *See* LR2-400.1(P)(4). LR2-400(G)(4) required district court judges to issue a scheduling order for criminal cases on various "tracks," and specified the period of time

---

[1] LR2-400 was recompiled and amended as LR2-308 NMRA, effective December 31, 2016. Any reference to the rule in this opinion will be cited as LR2-400, the version of the rule in effect at the time the district court made its ruling.

[2] A copy of LR2-400.1 is available at https://seconddistrictcourt.nmcourts.gov/case-management-order.aspx by selecting "Adopted Rule for 'Special Calendar.' "

12

before trial for filing pretrial motions. *See* LR2-400(G)(4)(a)(vi) (requiring pretrial motions in track 1 cases to be filed at least fifty days before trial); LR2-400(G)(4)(b)(vi) (requiring pretrial motions in track 2 cases to be filed at least sixty days before trial); and LR2-400(G)(4)(c)(vi) (requiring pretrial motions in track 3 cases to be filed at least seventy days before trial). LR2-400(I) stated that "[i]f a party fails to comply with any provision of this rule, including the time limits imposed by the scheduling order, the court shall impose sanctions as the court may deem appropriate in the circumstances[.]"

{20}     In accord with LR2-400, the district court issued scheduling orders on January 26, 2015,[3] setting an April 8, 2015 deadline for pretrial motions, and setting Defendants' cases for trial in July 2015. The scheduling order stated, in bold, that "[i]f a party fails to comply with the dates outlined in the [s]cheduling [o]rder, the Court shall impose sanctions. Sanctions may include, but are not limited to, dismissal with o[r] without prejudice, suppression or exclusion of evidence, a monetary fine imposed upon a party's attorney, or a monetary fine imposed on the attorney's employing office with appropriate notice to the office and opportunity to be heard." As provided for under the local rule, the scheduling orders also stated that the district court could grant a twenty-day extension for

---

[3]The file stamp on the face of the orders mistakenly states that they were filed on January 26, 2014.

13

good cause shown as long as it would not cause the trial date to be extended. *See* LR2-400(G)(6).

{21}    Defendant Chee filed her speedy trial dismissal motion on June 4, 2015, and Defendant Candelaria filed his counterpart motion on June 10, 2015, both well after the April 8, 2015 deadline. Neither motion acknowledged that the pretrial motion deadline had previously expired, nor made any attempt to show good cause to support an extension. The district court, without reaching the merits of Defendants' speedy trial arguments, summarily denied the motions because they were filed after the scheduling order's pretrial motion deadline.

{22}    As a threshold matter, we must first decide whether Defendants' challenges to the district court's authority to apply the timeliness requirements of LR 2-400 to their speedy trial motions were preserved for appellate review. The State argues that Defendant Candelaria did not preserve his claim because he never challenged the district court's authority to enforce its scheduling order. Even if not preserved, we exercise our discretion to address it here because the question whether speedy trial motions are subject to the deadlines set forth in pretrial orders presents an issue of law that is likely to recur in the Second Judicial District Court, and perhaps elsewhere, making it a matter of general public interest. *See* Rule 12-321(B)(2)(a) NMRA; *Azar v. Prudential Ins. Co. of Am.*, 2003-NMCA-062, ¶ 28, 133 N.M. 669, 68 P.3d 909 (stating that a matter of general public interest is one

14

that "is likely to settle a question of law affecting the public at large or a great number of cases and litigants in the near future"). As to Defendant Chee, she first raised a challenge to the district court's authority to deny her speedy trial motion as untimely in her reply brief on appeal, and therefore, technically speaking, she abandoned this claim. *See State v. Hosteen*, 1996-NMCA-084, ¶ 20, 122 N.M. 228, 923 P.2d 595 (stating that claims not argued in an appellant's brief in chief are "deemed abandoned"). Nevertheless, because we are addressing Defendant Candelaria's identical claim, we will address hers as well.

{23} We conclude that the district court had the authority, both inherent and under LR2-400, to deny Defendants' speedy trial motions as untimely under the pretrial scheduling order. *See State v. Le Mier*, 2017-NMSC-017, ¶ 29, 394 P.3d 959 (stating that "our courts are encouraged to ensure the timely adjudication of cases, to proactively manage their dockets, and to utilize appropriate sanctions to vindicate the public's interest in the swift administration of justice"); *State v. Ahasteen*, 1998-NMCA-158, ¶ 28, 126 N.M. 238, 968 P.2d 328 (acknowledging district courts' inherent authority to control their dockets), *abrogated on other grounds by State v. Savedra*, 2010-NMSC-025, ¶¶ 3, 8, 148 N.M. 301, 236 P.3d 20. A pretrial motion deadline serves several important purposes: it provides the district court with sufficient time to review legal arguments and evidence that may affect a future trial, and affords the opposing party a fair opportunity to muster

arguments and evidence in response to the motions. If district courts lacked the authority to set and enforce pretrial motion deadlines, and were obligated to drop everything and entertain a party's last-minute motions, then defendants or the State could wait until the eve of trial to file pretrial motions intended to disrupt the proceedings. New Mexico law does not require such a result.

{24}     Defendants do not dispute that they filed their motions to dismiss well after the filing deadline for pretrial motions under the scheduling order, nor do they deny that district courts generally have the authority under LR2-400 and their own inherent powers to sanction parties who fail to comply with pretrial motion deadlines. Nor do Defendants argue that they were unable to file their speedy trial motions before the pretrial deadline passed. Instead, Defendants argue that motions raising speedy trial claims are exempt from the district court's authority to set and enforce a pretrial motion deadline.

{25}     In support of this contention, Defendant Candelaria relies on *State v. Taylor*, 2015-NMCA-012, 343 P.3d 199, for the proposition that "[t]he right to a speedy trial is fundamental and is not waived even if never asserted[,]" and argues that a district court must consider and rule on a speedy trial motion, even one filed in violation of a properly-issued scheduling order. *Id.* ¶ 18 (citing *State v. Garza*, 2009-NMSC-038, ¶ 32, 146 N.M. 499, 212 P.3d 387). We disagree. Defendant Candelaria takes the quoted language out of context. *Taylor* does not stand for the

16

proposition that the right to assert a speedy trial violation is somehow immune from the district court's authority to set pretrial motion deadlines. *See* 2015-NMCA-012, ¶ 18. In *Taylor*, we merely held that a defendant who stipulated to a continuance for a specific purpose was not foreclosed from asserting his right to a speedy trial later on in the proceedings. *Id.* In so holding, this Court relied on *Garza*, in which our Supreme Court explained that even if a criminal defendant does not assert the right to a speedy trial at the beginning of a case or in a vigorous fashion, he or she is not foreclosed from asserting that right in the future. *See* 2009-NMSC-038, ¶¶ 31-34. Rather, the manner and timing of a defendant's assertion of the right to a speedy trial is simply one of several factors that a court considers when analyzing a speedy trial claim. *Id.*

**{26}** Defendant Candelaria also relies on *State v. Aragon*, 1982-NMCA-173, ¶ 10, 99 N.M. 190, 656 P.2d 240, as supporting the notion that a speedy trial motion is not subject to time limits set forth in the rules of criminal procedure or in the local rules. But that case held no such thing. Rather, *Aragon* stands for the commonsense proposition that a criminal defendant cannot be expected to file a speedy trial motion *before* a claim materializes. In *Aragon*, the district court refused to consider the defendant's motion to dismiss under the so-called six-month rule, because another, then-existing rule required that pretrial motions be filed within twenty days after the defendant's arraignment. This put the defendant

in an impossible position, because it would have required him to seek dismissal under the six-month rule before a violation of that rule even occurred. This Court concluded that the defendant's dismissal motion was timely raised, reasoning that "[a] defendant cannot be held to speculate at the time of arraignment or within twenty days therefrom whether there may be a violation of the six[-]month rule." *Id.* ¶ 10. The present case is easily distinguishable because Defendants' speedy trial claims had already accrued, and could have been asserted, before the pretrial motion deadline expired in April 2015. In their speedy trial motions, filed in July 2015, Defendants Candelaria and Chee both argued that the elapsed time from the filing of the indictment exceeded two and a half years, well beyond the time period necessary to trigger a speedy trial inquiry. Even if Defendants had filed their dismissal motions two months earlier, by the April 2015 scheduling deadline, the length of delay at that time would still have triggered an inquiry into the speedy trial factors. *See Garza*, 2009-NMSC-038, ¶ 2 (extending "the length of delay necessary to trigger the speedy trial inquiry to twelve months for simple cases, fifteen months for cases of intermediate complexity, and eighteen months for complex cases").

{27}     Defendants' reliance on *State v. Urban*, 1989-NMCA-053, 108 N.M. 744, 779 P.2d 121, and *State v. Lujan*, 1985-NMCA-111, 103 N.M. 667, 712 P.2d 13, also fails. Defendants cite these cases for the proposition that a motion asserting a

fundamental right to due process is not subject to pretrial motion deadlines. Again, we disagree. The statements in *Lujan* and *Urban*, on which Defendants rely, are terse and devoid of analysis. *See Urban*, 1989-NMCA-053, ¶ 24; *Lujan*, 1985-NMCA-111, ¶ 29. By contrast, a long line of New Mexico cases squarely holds that motions asserting the denial of constitutional rights are indeed subject to pretrial motion deadlines. *See, e.g.*, *State v. Rivas*, 2017-NMSC-022, ¶ 58, 398 P.3d 299 (Nakamura, C.J., specially concurring) (recognizing that untimeliness of a defendant's motion to suppress is "a complete and sufficient basis for denying the motion"); *City of Santa Fe v. Marquez*, 2012-NMSC-031, ¶ 28, 285 P.3d 637 (stating that "Rule 5-212(C) [NMRA] requires that motions to suppress be filed before trial and that the district courts must adjudicate suppression issues before trial, absent good cause"); *State v. Vialpando*, 1979-NMCA-083, ¶ 6, 93 N.M. 289, 599 P.2d 1086 (failing to file a motion to suppress within the time frame required by our rules of criminal procedure held to provide sufficient grounds to deny the motion); *State v. Helker*, 1975-NMCA-141, ¶ 7, 88 N.M. 650, 545 P.2d 1028 (stating "we hold that the rules of criminal procedure can put a time limitation on the exercise of a constitutionally protected right"). We do not see, and Defendants do not explain, how a broad reading of the cited language in *Lujan* and *Urban*, language unaccompanied by any serious analysis, can be reconciled with this line of cases.

19

**{28}** We hold that the district court properly denied Defendants' speedy trial motions as a sanction for their untimely filing.

### III. Defendant Candelaria's Two Fraud Convictions Violate Double Jeopardy

**{29}** Defendant Candelaria claims that his two convictions for fraud violate his right to be free from double jeopardy, arguing that because the two corresponding jury instructions covered overlapping time periods it is possible that he was convicted twice for the same conduct. We review de novo a defendant's claim that his right to be free from double jeopardy was violated. *See State v. Boergadine*, 2005-NMCA-028, ¶ 12, 137 N.M. 92, 107 P.3d 532.

**{30}** Defendant Candelaria was convicted of two counts of fraud—Count 11 (fraud over $2,500 but less than $20,000), relating to conduct occurring between September 22, 2008, and January 22, 2009; and Count 13 (fraud over $20,000), which encompassed acts from July 8, 2008 to January 22, 2009. Aside from the increased dollar amount and the extended date range, the indictment and jury instruction for Count 13 are identical to those relating to Count 11, and nowhere in these documents does the State describe the specific conduct on which these charges are based.

**{31}** Defendant Candelaria objected to the overlapping date ranges in the jury instructions at trial, and the State responded that the difference between the two counts was in the way that the various checks were deposited, but did not make it

20

clear what that difference was. The district court ruled that it would allow the date ranges to overlap, but would address the issue at sentencing if it remained an issue at that time. Defendant Candelaria did not raise the matter again.

**{32}** Both the New Mexico and United States Constitutions guarantee defendants the right not to "be twice put in jeopardy for the same offense." *State v. Armendariz*, 2006-NMSC-036, ¶ 19, 140 N.M. 182, 141 P.3d 526 (internal quotation marks and citations omitted), *overruled on other grounds by State v. Swick*, 2012-NMSC-018, ¶ 31, 279 P.3d 747. The double jeopardy clause "protects against multiple punishments for the same offense." *Swafford v. State*, 1991-NMSC-043, ¶ 6, 112 N.M. 3, 810 P.2d 1223 (internal quotation marks and citation omitted). Accordingly, the pertinent question "is whether the defendant is being punished twice for the *same offense*." *Id.* ¶ 8.

**{33}** There are two types of multiple punishment cases—unit of prosecution cases and double description cases. *Id.* ¶¶ 8-9. This case is a unit of prosecution case, because Defendant Candelaria alleges that his two convictions for fraud violate his right to be free from double jeopardy. "In unit of prosecution cases, the defendant is charged with multiple violations of a single statute based upon acts that may or may not be considered a single course of conduct." *State v. Bello*, 2017-NMCA-049, ¶ 11, 399 P.3d 380 (internal quotation marks and citation omitted).

21

{34}     Typically, in a unit of prosecution case, we employ a two-part test to determine the Legislature's intent. *Swick*, 2012-NMSC-018, ¶ 33. We "analyze the statute at issue to determine whether the Legislature has defined the unit of prosecution. If the unit of prosecution is clear from the language of the statute, the inquiry is complete. If the unit of prosecution is not clear from the statute at issue, including its wording, history, purpose, and the quantum of punishment that is prescribed, courts must determine whether a defendant's acts are separated by sufficient 'indicia of distinctness' to justify multiple punishments." *Id.* We note that we have already determined that the Legislature did not clearly define the unit of prosecution for fraud. *See Boergadine*, 2005-NMCA-028, ¶ 20.[4] Accordingly, the statutory definition of fraud provides no guidance in deciding whether the conduct in this case constitutes two acts of fraud, or just one.

{35}     Because the unit of prosecution for fraud has not been clearly defined by the Legislature, the parties each encourage us to apply the six-factor test set forth in *Herron v. State*, 1991-NMSC-012, ¶ 15, 111 N.M. 357, 805 P.2d 624, to determine whether the conduct in this case contained "sufficient indicia of distinctness" to justify multiple convictions. But even if we were to apply the *Herron* factors and

---

[4] The Legislature amended the fraud statute, Section 30-16-6, in 2006, roughly a year after *Boergadine* was decided. However, the amendments did not affect *Boergadine*'s unit of prosecution analysis. They simply changed the dollar amounts associated with each level of punishment, and added language stating that the misappropriation or taking of a firearm valued at less than $2,500 is a fourth degree felony. *See* § 30-16-6.

find the acts sufficiently distinct, this would not resolve the question of whether the date ranges charged in the jury instructions could have allowed the jury to convict Defendant Candelaria twice for the same underlying act.

**{36}** We addressed a similar issue in *State v. Cook*, 2006-NMCA-110, 140 N.M. 356, 142 P.3d 944. In *Cook,* we considered whether the defendant's two convictions for tampering with evidence violated his right to be free from double jeopardy where the jury instructions were undifferentiated, and the counts in the indictment were identical. *Id.* ¶ 7. We observed that the evidence supporting the two counts of tampering with evidence "was occasionally vague and equivocal," and that the parties' closing arguments did not clarify the factual basis for each count. *Id.* ¶¶ 11-12. We held that, even if the evidence could have supported two different counts, because the jury instructions "did not make clear to the jury which conduct it should consider to support each charge" the two convictions for tampering with evidence violated the defendant's double jeopardy rights. *Id.* ¶ 19.

**{37}** Although the two counts in *Cook* covered the same time frame, and here we simply have an overlap of the time period at issue, we believe *Cook* to be instructive. There, we vacated one conviction for tampering with evidence because the jury could have relied on the same evidence in convicting the defendant of the same crime twice. *See id.* ¶¶ 18-19. A similar danger is present here, because the jury could have relied on evidence that fell within the overlapping time period to

23

convict Defendant Candelaria of both counts of fraud. Accordingly, we examine the State's closing argument to determine whether it clarified the factual basis for the fraud counts. *See State v. Luna*, 2018-NMCA-025, ¶ 10, ___ P.3d ___ (noting that we may look to the State's closing argument for evidence of the specific factual basis supporting its theory of the case), *cert. denied*, 2018-NMCERT-___ (No. S-1-SC-36896, March 16, 2018).

{38}   During its closing argument, the State attempted to differentiate between the two counts of fraud, but at times appeared to conflate them. The State addressed Count 11 as follows:

> [B]asically, this fraud count, this September 22nd to January 22nd, this is referring to the behavior where [Defendants] Chee and Candelaria worked together. [They] would write checks to [Defendant] Candelaria. He would sign them over, 'Pay to the order of Chee,' they would be deposited into her account and then immediately withdrawn. That's what we're looking at.
>
> So we're looking at September through January. We know in that time there was a lot of money taken just by [Defendant Candelaria]. Here we have $15,000 in September; $4,000 in October, $2,000 in January. We have to show that they obtained over $2,500— she obtained over $2,500 as a result of this.
>
> Well, just looking at the [Defendant Candelaria] check, just in October we have $4,500 deposited into her account, immediately withdrawn. So yes, we hit that $2,500 mark.

{39}   Later, the State addressed Count 13 as follows:

> And lastly, we have fraud over $20,000. We're looking at the time periods between July 8, 2008, and . . . January 22nd, 2009. During that time, we have all of those checks deposited into his

24

account. In just August we have $25,000 of checks in his name deposited into Nora Chee's account. And we know also that on months when there weren't any checks in his name, he was receiving payouts from her. . . . The total obtained between the two of them was $214,000. So we hit that $20,000 amount. . . . And this happened between July and January of 2009. So during that time, just in checks to him, just in checks deposited into [Defendant] Chee's account, we have $52,000 of checks written to him, deposited into her account, endorsed by him before they're deposited. That's the fraud.

Based on the discussion above, it is not clear how the two counts are distinguishable. In discussing both counts, the prosecutor referred to checks written to Defendant Candelaria, which were then endorsed over to Defendant Chee and deposited into one of her bank accounts.

**{40}** Because the factual basis for differentiating between Counts 11 and 13 is not clear from the indictment, the jury instructions, or even the State's closing argument, we conclude that the jury could have convicted Defendant Candelaria twice for the same conduct. *See Cook*, 2006-NMCA-110, ¶ 19. Accordingly, we remand this case to the district court with instructions that the fraud count carrying the lesser sentence be vacated. *See State v. Montoya*, 2013-NMSC-020, ¶ 55, 306 P.3d 426 (holding that the conviction carrying the shorter sentence must be vacated when it is necessary to vacate a conviction to avoid violating the double jeopardy clause).

**IV.  The District Court Did Not Abuse Its Discretion in Admitting Evidence**

25

{41} Defendants challenge several of the district court's evidentiary rulings. We address each of them in turn. "We review the admission of evidence under an abuse of discretion standard and will not reverse in the absence of a clear abuse." *State v. Sarracino*, 1998-NMSC-022, ¶ 20, 125 N.M. 511, 964 P.2d 72. "An abuse of discretion occurs when a ruling is against logic and is clearly untenable or not justified by reason." *Id*. (internal quotation marks and citation omitted).

**A.     Late-Disclosed Evidence**

{42} Defendants argue that the district court abused its discretion in allowing the State to present evidence that it did not disclose until two weeks before trial, and declining to give them a continuance to further investigate the evidence disclosed, or sanction the State for the late-disclosed evidence. We are not persuaded.

{43} While preparing to be a witness at trial, Mr. Savitsky discovered a letter written in 2000 by Ed Teixeira, then the executive vice president and chief operating officer of ATC, advising Defendant Chee that she was not allowed to write quick pay checks to herself because she was a principal of the franchise, and advising her that nine quick pay checks that she had written to herself had been stopped. Mr. Teixeira also discovered additional checks "tending to incriminate co-defendant Candelaria." He provided the evidence to the State, which turned it over to defense counsel the next day.

{44} We first address Defendant Candelaria's argument that the district court was required to sanction the State for the late disclosure under LR2-400 and Rule 5-501 NMRA. We reject this argument because the State did not violate the rules when it turned over the evidence to the defense one day after it was received from Mr. Teixeira. *See* LR2-400(D)(3) (2014) ("The state shall have a continuing duty to disclose additional information to the defendant within five (5) days of receipt of such information.").

{45} In deciding whether the district court abused its discretion in admitting the late-disclosed evidence, or declining to grant a continuance for the defense to investigate and respond to it, we consider the following factors: "(1) whether the [s]tate breached some duty or intentionally deprived the defendant of evidence; (2) whether the improperly non-disclosed evidence was material; (3) whether the non-disclosure of the evidence prejudiced the defendant; and (4) whether the trial court cured the failure to timely disclose the evidence." *State v. Duarte*, 2007-NMCA-012, ¶ 15, 140 N.M. 930, 149 P.3d 1027 (internal quotation marks and citation omitted). "The test for materiality . . . is whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (internal quotation marks and citation omitted).

{46} With regard to the letter to Defendant Chee from Ed Teixeira, we hold that the district court did not abuse its discretion in admitting it into evidence and not

27

granting a continuance. We have already concluded that the State did not violate any discovery obligation because it produced the letter to Defendants one day after it was received. We do not believe that earlier disclosure of the letter would have changed the result of the case, nor did it unfairly prejudice Defendants, because it was cumulative of Mr. Savitsky's testimony that Defendant Chee was aware that she was not permitted to write quick pay checks to herself, and that the use of quick pay checks was limited to payments for nurses in amounts of $500 or less. Defendants explored this testimony during pretrial interviews with Mr. Savitsky, and were thus aware of this evidence well in advance of trial, regardless of when they received the letter. Moreover, the district court attempted to cure any possible prejudice by granting defense counsel's request "to talk to Mr. Savitsky for five or ten minutes" about the letter before he testified at trial. After this interview, Defendants did not request additional time to discuss the issue with Mr. Savitsky or assert any further need to investigate the letter. Because Defendants were already aware of the substance of this evidence, earlier disclosure of the letter would not have changed the outcome of the trial.

{47} Defendant Chee argues that she was unfairly prejudiced by the late disclosure of the letter, and that the district court should have granted a continuance, because "[g]iven the eight[-]year gap between the letter and the charging period, it is possible that ATC could have had other letters or

correspondence in its possession that were also written to Nora Chee, but which may have told Chee a different and conflicting message." A continuance, she argues, would have allowed her to subpoena ATC's records to discover whether any contrary information existed. But Defendant Chee already knew, before the letter was disclosed, that ATC witnesses would testify that she was aware that she lacked permission to write quick pay checks to herself. Thus, she did not need the letter to alert her to the potential benefit of subpoenaing ATC to discover whether it had any written records that might have contradicted its position that she was not allowed to write checks to herself.

{48} With regard to the late-disclosed checks, Defendant Chee contends that their earlier disclosure might have altered her defense strategy in some unspecified way, or caused her to move to sever the trial, but she does not explain why those checks would have prompted her to do so. We decline to review this undeveloped claim, because "[w]e will not review unclear arguments, or guess at what [a party's] arguments might be." *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076. Even if Defendant Chee had developed an argument along these lines, we would still decline to review it because, as she admits, the checks were not made part of the appellate record and, therefore, we would not be able to review their content or evaluate their potential effect on Defendant Chee's defense strategy. *See State v. Jim*, 1988-NMCA-092, ¶ 3, 107 N.M. 779, 765 P.2d

29

195 ("It is [the] defendant's burden to bring up a record sufficient for review of the issues he raises on appeal.").

## B. Testimony of the Substitute Records Custodian

**{49}** At trial, the district court excluded Stephanie Baca, a records custodian for the Metropolitan Detention Center (MDC), from testifying as a witness for the State because she was present in the courtroom during the testimony of other witnesses, in violation of Rule 11-615 NMRA. The district court allowed the State to call a different witness, Michael Martindale, who was the civil litigation administrator for MDC, and Ms. Baca's supervisor, to testify as records custodian. Defendant Chee argues that it was improper to allow this "surprise witness" to authenticate a letter written by Defendant Candelaria to Defendant Chee. In the letter, written while both Defendants were incarcerated at MDC, Defendant Candelaria admitted to committing the crimes, and said he would testify that Defendant Chee was unaware of his conduct. Defendant Chee argues that Mr. Martindale did not properly authenticate the letter, and that the district court should not have allowed him to testify because her attorney only had a few minutes to interview Mr. Martindale before he testified.

**{50}** We reject this claim, because Defendant Chee does not explain how allowing Mr. Martindale to testify prejudiced her. *See State v. Griffin*, 1988-NMCA-101, ¶ 11, 108 N.M. 55, 766 P.2d 315 ("Failure to disclose a witness'[s]

30

identity prior to trial in itself is not grounds for reversal. The objecting party must show that he was prejudiced by such non-disclosure.") Accordingly, we decline to reverse the district court on this basis. *See id.* We also do not see, and Defendant Chee does not explain, how the letter's admission prejudiced her. After all, the letter contained Defendant Candelaria's confession to committing the crimes, and essentially absolved Defendant Chee from any criminal wrongdoing. Thus, we need not consider her claim that the letter was not properly authenticated.

**C.     Defendant Candelaria's Challenge to the Admission of His Booking Sheet, Racist Tattoo, and Letter to Defendant Chee**

{51}     Defendant Candelaria challenges the admission of his letter to Defendant Chee, in which he confessed to committing the crimes, arguing that it was not properly authenticated by Mr. Martindale. Defendant Candelaria also argues that the admission of his booking sheet at the MDC, and the fact that he was required to show the jury his forearm tattoo, which he contends bore a racist image, exposed the jury to unfairly prejudicial evidence.

31

## 1.    Defendant Candelaria's Letter to Defendant Chee

{52}    Mr. Martindale was called to authenticate a letter that Defendant Candelaria wrote to Defendant Chee, in which he confessed to the crimes, indicated that he intended to "implicate David Savitsky in a plan to take the franchise" from Defendant Chee and to testify that she was unaware of his conduct, and instructed Defendant Chee to destroy the letter. Defendant Candelaria argues that Mr. Martindale was unable to properly authenticate the letter that was admitted into evidence because he did not have personal knowledge of the letter, had not seen the original letter, could not identify Defendant Candelaria's handwriting, and was not able to produce a mail log for the letter.

{53}    The envelope that contained the letter was addressed to Defendant Chee in "F8-13[,]" and stated that Defendant Candelaria was in "E-7, Cell 13." Mr. Martindale testified that Defendant Chee was assigned to Unit F, Pod 8, Cell 13, and that Defendant Candelaria was assigned to Unit E, Pod 7, Cell 13, the locations specified in the letter. Mr. Martindale also testified about the general procedures that are followed when an inmate is booked and when an inmate receives mail. He testified that the mail log for the letter was never located despite efforts to find it. He also testified that he had not seen the original letter, but only saw photocopies of the letter and the envelope it purportedly came in.

32

{54} Our rules of evidence provide that evidence is authenticated if a party can "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 11-901(A) NMRA. A party can authenticate an item by providing evidence of the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Rule 11-901(B)(4). A writing can be shown to have come from a specific person "by virtue of disclosing knowledge of facts known peculiarly to him[.]" Fed. R. Evid. 901 advisory committee note, Example (4); *see State v. Loza*, 2016-NMCA-088, ¶ 22, 382 P.3d 963 (noting that New Mexico courts refer to federal cases for guidance on authentication issues).

{55} We conclude that the evidence was sufficient to permit a reasonable jury to believe that Defendant Candelaria wrote the letter to Defendant Chee. The letter included Defendants' cell numbers in the MDC, and Mr. Martindale confirmed Defendants were indeed housed in those locations. The letter also contained facts peculiarly known to Defendant Candelaria, and statements that only someone in his position would make, including that Defendant Chee's business was a franchise; that David Savitsky was involved in the case; that the case involved writings (as evidenced by the letter's statement that a handwriting expert would exonerate Defendant Chee); and contained several statements that he loved Defendant Chee. To be sure, Defendants made arguments weighing against the

33

letter's authenticity, but those went to the weight of the evidence, not its admissibility. We therefore hold that it was not an abuse of discretion for the district court to determine that the letter had been sufficiently authenticated.

**D.     The Booking Sheet and Tattoo**

{56}     Defendant Candelaria argues that allowing his MDC booking sheet to be admitted into evidence, and requiring him to show the jury his forearm tattoo, were unfairly prejudicial, and should have been excluded under Rule 11-403 NMRA ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."). We disagree.

{57}     A booking sheet is created by jail staff, based on information that arrestees provide them when they are brought into the jail. The booking sheet here contained Defendant Candelaria's photograph, stated that he had a "Fu Manchu" tattoo, identified Defendant Chee as his emergency contact and as his girlfriend, and stated that they shared the same address. Defendant Candelaria contends that the booking sheet and the tattoo only demonstrated that Defendant Candelaria knew Defendant Chee, arguing "[t]he State conflates identity with proof that [Defendant] Candelaria committed the crime." Defendant's contention misses the mark. At trial, the State did not present any eyewitness testimony, or photographic or videographic evidence, that Defendant Candelaria had written or cashed the quick pay checks. Defendant Candelaria affirmatively relied on the absence of such

34

evidence at trial, and even moved for a directed verdict on that basis. Admitting the booking sheet, and requiring Defendant Candelaria to show his tattoo to the jury, tended to establish that he was indeed the same person who had been booked into the MDC, that he was there at the same time as Defendant Chee (her booking sheet was also admitted into evidence), and inferentially that he was the author of the letter to Defendant Chee admitting that he committed the crimes. This evidence, combined with the letter itself and Mr. Martindale's testimony linking the letter to Defendants' location within the jail, provided a nexus between Defendant Candelaria and the crimes charged. The evidence therefore had substantial probative value.

{58} As for the other prong of the Rule 11-403 analysis, Defendant Candelaria has failed to demonstrate that the probative value of this evidence was substantially outweighed by a danger of unfair prejudice. Defendant Candelaria argues that the booking sheet was unnecessary because he "never claimed that he was not Karl Candelaria or that police did not arrest him," but this argument misses the point. Defendant Candelaria did not admit that he was the author of the incriminating letter, and the booking sheet helped to show that he was its author. As for the tattoo, Defendant Candelaria's counsel argued that it depicted a "caricature of an Asian man with kind of an exaggerated head dress and mustache, and very slanted eyes[,]" and that it therefore could potentially offend the jury. Defendant

35

Candelaria, however, failed to include a photograph of the tattoo in the appellate record, and we are therefore unable to fairly evaluate the potential for unfair prejudice created by the tattoo. It was Defendant Candelaria's burden to provide a complete record for our review on appeal, and we decline to reverse the district court's ruling on this basis. *Jim*, 1988-NMCA-092, ¶ 3 ("It is [the] defendant's burden to bring up a record sufficient for review of the issues he raises on appeal.").

**CONCLUSION**

{59} For the foregoing reasons, we remand this case to the district court with instructions to vacate Defendant Candelaria's fraud conviction carrying the lesser sentence. We affirm the district court's judgments and sentences against Defendant Candelaria and Chee in all other respects.

{60} **IT IS SO ORDERED.**

_____

**EMIL J. KIEHNE, Judge Pro Tempore**

**WE CONCUR:**

_____

**LINDA M. VANZI, Judge**

_____

36

**JULIE J. VARGAS, Judge**